# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
May 14, 2024 Session

## STATE OF TENNESSEE v. PHILLIP JEROME GARDNER, III & LATONIA MARIA GARDNER

**Appeal from the Criminal Court for Davidson County**
**No. 2019-C-1895    Walter C. Kurtz, Judge**

———————————————————

**No. M2022-01131-CCA-R3-CD**

———————————————————

In a joint trial, a Davidson County jury convicted Phillip Jerome Gardner, III, and Latonia Maria Gardner of felony murder committed in the perpetration of aggravated child neglect and three counts of aggravated child neglect. Additionally, Latonia Gardner was convicted of felony murder committed in the perpetration of aggravated child abuse and one count of aggravated child abuse. Each was sentenced to life plus seventeen years. On appeal, the Defendants raise separate issues. Ms. Gardner argues that the evidence is insufficient to support her convictions. She also alleges that the trial court erred when it failed to sever offenses; improperly admitted expert testimony and video evidence; gave a misleading supplemental jury instruction; and imposed consecutive sentencing. Mr. Gardner similarly challenges the sufficiency of the evidence supporting his convictions. He also argues that the trial court erred when it took under advisement his motion for a judgment of acquittal; failed to sever the Defendants; failed to exclude evidence of the victim's prior injuries; failed to instruct the jury on his alibi defense; and gave the same misleading supplemental jury instruction. Upon review, the court affirms Ms. Gardner's conviction and life sentence for felony murder in perpetration of aggravated child abuse. However, the court agrees with the parties that the jury was improperly instructed on one aggravated child neglect count, and we remand that count and its associated felony murder count for a new trial as to both Defendants. With the parties' agreement, we also reverse the order for consecutive sentences in Ms. Gardner's cases and remand for the trial court to consider the factors outlined in *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995). Finally, we remand both cases for entry of corrected judgments of conviction. In all other respects, we respectfully affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Criminal Court Affirmed in Part, Reversed in Part;**
**Cases Remanded**

Tom Greenholtz, J., delivered the opinion of the court, in which J. Ross Dyer and Kyle A. Hixson, JJ., joined.

Phillip Jerome Gardner, III, Pro Se (on appeal), Nashville, Tennessee, and Shaw Cunningham (at trial), Nashville, Tennessee, for the appellant, Phillip Jerome Gardner, III.

Emma Rae Tennent and Chris Street-Razbadouski (on appeal), Nashville, Tennessee, and William Allensworth and Jon Wing (at trial), Nashville, Tennessee, for the appellant, Latonia Marie Gardner.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Janice Norman and Jeffrey George, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

This case involves a four-year-old child, J.H.,[1] who died while in the Defendants' care. Latonia Gardner was J.H.'s stepmother, and her codefendant, Phillip Jerome Gardner, was J.H.'s biological father. J.H.'s biological mother had asked the Defendants to care for J.H. during the holiday season while she worked as a postal carrier for the United States Postal Service in Ohio. J.H.'s autopsy revealed that he had numerous scars, burn marks, thermal burns, broken bones, and brain injuries.

### A.    THE EVENTS LEADING TO DECEMBER 7, 2016

On November 27, 2016, Officer Rico Jones with the Goodlettsville Police Department received a call from a friend of the Defendants' teenage daughter, directing him to the Defendants' residence. When he arrived at their residence, the Defendants' teenage daughter met Officer Jones outside and showed him a video that showed a mark under J.H.'s left eye and marks on his back. Officer Jones then went into the residence with his supervisor. The Defendants and two other children were inside.

The officers asked the Defendants about J.H.'s injuries, and they told the officers that he had fallen into the bathtub and injured his eye. As for an explanation for the marks on his back, the Defendants told the officers that he hurt his back while he was playing

---

[1]    It is the policy of this court to identify minor victims by only their initials.

outside. Officers then asked J.H. what had happened, and he corroborated the Defendants' statements. The officers looked at J.H.'s back and saw two to three marks. Officer Jones observed no other injuries, although he did not look at J.H.'s stomach or buttocks. The two officers subsequently determined that further investigation was not necessary.

Ten days later, on December 7, 2016, Officers Charles Hausken and David Reid with the Goodlettsville Police Department responded to a call of an unresponsive child in possible cardiac arrest at the Defendants' address. Upon their arrival, Ms. Gardner answered the door screaming, and she pointed upstairs when one of the officers asked where the child was. Officer Hausken entered the bathroom and saw J.H. lying on the floor beside the bathtub with clear liquid in his ear, leading Officer Hausken to assume that he had drowned.

J.H. did not have a pulse and was cold to the touch. Officer Hausken began performing CPR. Every time he gave J.H. a breath, J.H. vomited into Officer Hausken's mouth. Officer Hausken spit the vomit into the bathtub and then continued CPR.

After paramedics took J.H. to the hospital, Officer Hausken asked Ms. Gardner what had happened. Ms. Gardner told Officer Hausken that J.H. had started to vomit, so she placed him over the side of the bathtub, and he subsequently went limp. Five days later, on December 12, 2016, J.H. passed away.

## B. DEPARTMENT OF CHILDREN'S SERVICES AND LAW ENFORCEMENT INVESTIGATION

After J.H. arrived at the hospital, the staff called the Department of Children's Services ("DCS") to investigate his injuries. Moneshiuna Perry, an investigative caseworker, responded and immediately went to J.H.'s hospital room, where he was unresponsive and on a ventilator. Ms. Perry observed the injuries to J.H.'s body, noting that his left eye was bruised and had scratches underneath it. She also observed that J.H. had bruising on the left side of his chest and burns on his buttocks. Ms. Perry concluded that these injuries were not accidental.

Ms. Perry then spoke with Mr. Gardner, who was calm and showed no emotion throughout the interview. Mr. Gardner explained that J.H. had lived with him, Ms. Gardner, and two other children since October 2016. Mr. Gardner also stated that he did not allow his extended family in his home because they disliked Ms. Gardner.

Mr. Gardner stated that J.H. had been defecating on himself and having various behavioral issues. Mr. Gardner told Ms. Perry that he punished J.H. by spanking him on the buttocks with a belt. He further stated that he was frustrated with J.H.'s behavior, did

3

not want to deal with him any longer, and would have driven J.H. back to his mother as soon as possible if it were an option. Mr. Gardner told Ms. Perry that Ms. Gardner was "good with the kids" and stayed home to care for them. Mr. Gardner had no issues with how Ms. Gardner treated J.H.

When Ms. Perry asked about J.H.'s injuries, Mr. Gardner said that his wife told him that J.H. had fallen once when he got out of the bathtub and fell again when she put him on the toilet. Ms. Perry further asked Mr. Gardner about the burns on J.H.'s hands, and he stated that he did not see the burns for two days because he worked. However, he then elaborated by saying that when he saw the bandages on J.H.'s hands, Ms. Gardner told him that J.H. was cleaning with bleach and had an allergic reaction. Mr. Gardner confirmed that he did not take the victim for medical treatment at any point.

Ms. Perry then observed the other two children and found no marks or bruises. She discovered that they were clean and well-kept, and when asked about discipline, the oldest child stated that they did not get disciplined. However, she also indicated that J.H. would get disciplined because Ms. Gardner was frustrated with him when he defecated on himself and that Ms. Gardner would make J.H. clean up the feces. Ms. Gardner told this child that the burns on J.H.'s hands were from bleach.

Next, Ms. Perry spoke to Ms. Gardner, who was unhappy that J.H. was living with them. Ms. Gardner consistently told Mr. Gardner that J.H. needed to return to his mother because he had several issues; in fact, they attempted to reach her, but she blocked their calls. She also believed that J.H. was purposefully defecating on himself and acting out because he missed his mother. She initially stated that J.H. had arrived at their house with scratches on his back but then later claimed that they were from J.H. scratching his dry skin.

As for J.H.'s injuries, Ms. Gardner claimed that the eye injury came from her placing him on the toilet and him falling off. Ms. Gardner said that she had heard a noise in the bathroom. She found J.H. in the bathtub and assumed the bruise on his forehead came from him falling in the bathtub. As for the burns on his hands and buttocks, Ms. Gardner claimed that she found J.H. cleaning the bathtub with bleach one day. However, she could not confirm the specific type of cleaner he used.

When asked about the events on December 7, Ms. Gardner showed no emotion while explaining that she had awoken J.H. from a nap and then took him to the bathroom, where he started vomiting. She claimed that after vomiting, J.H.'s stomach "went limp," and she called 911.

4

J.H.'s biological mother, LaShawna Hunter, arrived at the hospital, and she was hysterical. Ms. Hunter told Ms. Perry that she had taken J.H. to a doctor in Ohio before he came to Tennessee. Ms. Perry later contacted that doctor, who confirmed that there were no concerns about abuse or neglect at that time.

Goodlettsville detectives specializing in child abuse cases interviewed both Mr. and Ms. Gardner. Ms. Gardner told the officers the same stories that she had told Ms. Perry but distinguished that J.H. had used a spray bottle to clean the bathtub the day he got the burns on his hands and buttocks. One of the detectives then went into J.H.'s hospital room and took photographs of his body. She noted that there was discoloration on his chest, his head seemed enlarged, his hands had burns on them, his toes had blisters, he had marks on his face, and various scars and marks were on his back, legs, and buttocks.

Detectives confirmed that Mr. Gardner clocked in for work at 1:34 p.m. on December 7, 2016. Detectives also discovered that Mr. Gardner had spoken to family members about wanting to cut off communication with J.H.'s biological mother, claiming that J.H. would be depressed after speaking with her. Mr. Gardner then sent messages to his family members, instructing them not to contact him or Ms. Gardner.

### C. THE TRIAL

On August 13, 2019, a Davidson County grand jury issued a superseding indictment charging Mr. and Ms. Gardner with one count of felony murder committed during the perpetration of or attempt to perpetrate aggravated child abuse, one count of felony murder committed during the perpetration of or attempt to perpetrate aggravated child neglect, one count of aggravated child abuse resulting in serious bodily injury, and two counts of aggravated child neglect.[2] The trial started on March 21, 2022.

#### 1. State's Proof

At trial, the State presented testimony about J.H.'s physical condition from Ms. Perry, Detective Vaughn, and nurse practitioner Danielle Knox. Nurse Knox worked for the Child Abuse Response and Evaluation Team at Vanderbilt Children's Hospital in 2016, and the trial court qualified her as an expert in the field of pediatric child abuse. Nurse

---

[2] The original indictment charged the Defendants with one count of felony murder in the perpetration of aggravated child abuse. The superseding indictment also charged the Defendants with two additional counts of aggravated child abuse and aggravated child neglect arising from the treatment of J.H. during his time in their care. These counts were subsequently severed by the trial court and are not at issue in this appeal.

Knox completed a report on J.H.'s case. During her investigation, the Defendants told Nurse Knox the same story about the prior injuries and December 7 that they had told the others. Nurse Knox noted that she was "highly concerned" about J.H.'s injuries and determined that many were unusual and not accidental.

Nurse Knox's report included a burn team consult, during which an expert in burns examined J.H. This consult noted that the various burns on J.H. were likely from different methods, including chemical burns and cigarette burns, and were made at different times. The report determined that the burns affected several layers of skin, including the layer that involved the nerves, and J.H. would have been in pain.

Nurse Knox ultimately concluded that J.H.'s pain could have been lessened if he had received medical attention for any of his injuries. Nurse Knox concluded that J.H. would have been in pain and exhibiting physical symptoms for many of his injuries and that a prudent caregiver would have sought medical treatment. Finally, Nurse Knox concluded that "[t]he constellation of skin findings indicate[s] that [J.H.] has been a victim of child abuse on multiple occasions."

Ms. Hunter testified that she took J.H. to the Defendant's house on September 28, 2016, and that the Defendants did not allow her to speak to J.H. the entire time he was in their care. J.H. did not have any injuries before he visited the Defendants' house, and friends and family members testified that J.H. was a normal, happy child before his stay with the Defendants.

The State also presented the testimony of Dr. Thomas Deering, the Deputy Medical Examiner who performed J.H.'s autopsy, to offer an expert opinion on the cause and manner of J.H.'s death. As part of that opinion, he testified that the cause of death was hypoxic/anoxic encephalopathy, or the brain not receiving sufficient oxygen following a blunt force injury to the head. Dr. Deering also testified that a contributing cause of death was battered child syndrome or battered child appearance, which he characterized as a series or pattern of injuries that were indicative of child abuse because of the type and unexplained nature of the injuries suffered by the child. He further opined that the manner of death was a homicide, and he offered this testimony as part of a larger opinion that the December 7 injury suffered by J.H. was not the result of an accident but was "probably inflicted."

6

## 2.    Defense Proof

Ms. Gardner testified on her own behalf.  She stated that she did not abuse J.H. in any way and loved him as her own son.  She also said that J.H. had several marks on him when he arrived at their house in September and that she wanted Mr. Gardner to confront Ms. Hunter about them.  She did not report the marks or take J.H. to the doctor because the marks were "old" and Mr. Gardner assured her that J.H. was "never going back."  Ms. Gardner eventually admitted to spanking J.H. with a thin belt and "pop[ping]" him on his hands.

Ms. Gardner made J.H. clean his own clothes if he defecated on himself.  She testified that she never got frustrated with J.H. and said that if she spanked him, it only made him angrier.  To explain his injuries and scars, Ms. Gardner described that J.H. wore a diaper, picked and scratched at his wounds, scratched his face with a zipper, cleaned the bathroom with bleach when she was not watching, was tackled while playing, and fell in the bathroom several times.  Despite J.H.'s injuries being "dramatic looking," she did not seek medical care because J.H. never said he was in pain, and she knew how to take care of children.

Ms. Gardner testified that two days before she called 911 about J.H., he began to act "loopy," slurring his words and walking strangely.  According to Ms. Gardner, J.H. acted like nothing had happened the next morning, so she did not seek medical help.  As for the events on December 7, Ms. Gardner testified that J.H. was complaining about his head hurting and did not want to get out of bed when instructed.  When she took him to the bathroom, J.H. vomited twice and then became unresponsive.  Ms. Gardner then called 911.

Regarding the video taken by the Defendants' daughter, Ms. Gardner claimed that she filmed it and sent it to a friend to be "vindictive."  She stated that during her daughter's visit to their house, she questioned Ms. Gardner on why she had hit J.H.  Ms. Gardner explained that she just "popped him on his forehead" and that she was not "popping him hard."  She further testified that her daughter left early because the visit became "tense" due to her daughter's behavior.

Ms. Gardner's seventeen-year-old daughter, who lived with the Defendants, testified at trial.  She remembered J.H. visiting them once before and said that he was very different when he came to see them this time.  J.H. defecated on himself, and Ms. Gardner punished him by making him do exercises, such as push-ups and holding phone books, or spanking him.  Ms. Gardner's daughter confirmed that J.H. had cleaned the bathtub and then developed blisters on his hands, which she witnessed him picking at and told him to

7

stop. She also stated that she was in the house when J.H. fell in the bathtub and off the toilet.

Dr. John Hunsaker, an expert in the field of forensic pathology, reviewed Dr. Deering's report and findings and agreed with Dr. Deering's cause of death and signs of abuse. However, he disagreed with Dr. Deering's conclusion that the fatal head injury was inflicted on December 7, instead believing that the trauma occurred at least three days earlier. He also disagreed with Dr. Deering's conclusion that the brain injuries would have been immediately apparent. Dr. Hunsaker also questioned Dr. Deering's decision to include multimodality trauma as a contributory cause of J.H.'s death, claiming that he had never seen an autopsy characterize a cause of death in this manner and believing that it went beyond what a medical examiner should do in a case. Dr. Hunsaker believed that the Defendants' version of events was plausible.

### 3. Verdict, Sentences, and Appeal

The jury found Ms. Gardner guilty as charged of two counts of first degree felony murder, one count of aggravated child abuse, and three counts of aggravated child neglect. It also found Mr. Gardner guilty of felony murder accomplished through aggravated child neglect and three counts of aggravated child neglect. However, the jury acquitted Mr. Gardner of the charges related to felony murder during the perpetration of aggravated child abuse and aggravated child abuse.

After a sentencing hearing on June 9, 2022, the trial court sentenced each Defendant to an effective sentence of life imprisonment plus seventeen years. Both Defendants filed timely motions for a new trial, which the trial court denied on August 10, 2022. Mr. Gardner filed a timely notice of appeal nine days later. Ms. Gardner also filed a timely notice of appeal twenty-nine days later.

### ANALYSIS

Although the Defendants were tried in a joint trial, they largely raise different issues and arguments in this appeal. As such, in this consolidated case, we will address the issues raised by each Defendant separately. We address the issues in Ms. Gardner's appeal first and refer to her as "the Defendant" until we turn to the issues raised by Mr. Gardner.

# I.   ISSUES RAISED BY LATONIA GARDNER

In this appeal, the Defendant argues that the evidence is legally insufficient to support her conviction for felony murder that was committed during the perpetration of or attempt to perpetrate aggravated child neglect and one of her aggravated child neglect convictions. She also asserts that the trial court erred by permitting Dr. Deering to testify about battered child syndrome without ensuring that his testimony was based upon relevant scientific methods. She also argues that the trial court erred by failing to sever some of the offenses, allowing the State to introduce a video of the victim, and providing a misleading jury instruction. Finally, she contends that the trial court abused its discretion in imposing consecutive sentences. We address each of these issues in turn.

## A.   LEGAL SUFFICIENCY OF THE EVIDENCE

The Defendant argues that the evidence is legally insufficient to support her conviction for felony murder based on aggravated child neglect and one of her convictions for aggravated child neglect.[3] Specifically, she asserts that the State failed to prove that there was serious bodily injury arising out of aggravated child neglect separate and apart from J.H.'s injuries alleged in the aggravated child abuse charges. In response, the State argues that the proof was sufficient to establish that J.H. experienced several other injuries while in the Defendant's care, therefore establishing separate injuries between the neglect and abuse. We agree with the State.

### 1.   Standard of Appellate Review

"The standard for appellate review of a claim challenging the sufficiency of the State's evidence is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Miller*, 638 S.W.3d 136, 157 (Tenn. 2021) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard of review is "highly deferential" in favor of the jury's verdict. *See State v. Lyons*, 669 S.W.3d 775, 791 (Tenn.

---

[3]   The Defendant seems to argue that the evidence is also insufficient to support her other aggravated child neglect convictions in Counts 9 and 10, respectively. However, she does not raise this in her issue statement or point heading, and she offers no argument on this point. For these reasons, we find that the challenge to the sufficiency of the evidence on those counts is waived. *See State v. Molthan*, No. M2021-01108-CCA-R3-CD, 2022 WL 17245128, at *2 (Tenn. Crim. App. Nov. 28, 2022), *no perm. app. filed.* Additionally, the Defendant does not argue that the evidence is legally insufficient to support her aggravated child abuse and corresponding felony murder conviction. As such, we do not address the evidence supporting these convictions further. *See* Tenn. R. App. P. 13(b) ("Review generally will extend only to those issues presented for review.").

2023).  Indeed, "[w]hen making that determination, the prosecution is afforded the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom."  *State v. Thomas*, 687 S.W.3d 223, 249 (Tenn. 2024) (citation and internal quotation marks omitted).  To that end, "[w]e do not reweigh the evidence, because questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the jury, as the trier of fact."  *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (citations omitted).  "The standard of review is the same whether the conviction is based upon direct or circumstantial evidence."  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citation and internal quotation marks omitted).

### 2.      First Degree Felony Murder and Aggravated Child Neglect

The Defendant does not challenge her conviction for first degree felony murder committed in the perpetration of aggravated child abuse.  However, she does challenge her convictions for felony murder committed in the perpetration of aggravated *child neglect*, as well as the underlying charge of aggravated child neglect.  First degree felony murder is defined as the "killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child neglect[.]"  Tenn. Code Ann. § 39-13-202(a)(2) (2018).  No culpable mental state is required for a felony murder conviction except the intent to commit the underlying felony, *id.* § 39-13-202(b), and the defendant "must intend to commit the underlying felony at the time the killing occurs[.]"  *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999).  In determining whether the killing occurred during the perpetration of the felony, our supreme court has stated that "consideration of such factors as time, place, and causation is helpful in determining whether a murder was committed 'in the perpetration of' a particular felony."  *Id.* at 106.  Further, "the killing may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action."  *Id.*

To sustain the Defendant's conviction for first degree felony murder, the State must first establish that the underlying felony of aggravated child neglect occurred.  As charged in this case, aggravated child neglect occurs when a person commits the offense of child neglect, and the neglect "results in serious bodily injury to the child[.]"  Tenn. Code Ann. § 39-15-402(a)(1) (2018).  The offense of child neglect is defined as "[a]ny person who knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare."  *Id.* § 39-15-401(b) (2018); *see State v. Mateyko*, 53 S.W.3d 666, 671-72 (Tenn. 2001).

The code does not provide for a specific definition of "neglect."  *State v. Sherman*, 266 S.W.3d 395, 405 (Tenn. 2008).  However, our supreme court has recognized that "a child is neglected whenever the breach of a legal duty endangers the health or welfare of

that child or otherwise places the child's health or welfare at some risk of harm." *Mateyko*, 53 S.W.3d at 671. Consistent with *Mateyko*, *Black's Law Dictionary* defines neglect as meaning "to omit, fail, or forbear to do a thing that can be done, or that is required to be done, but it may also import an absence of care or attention in doing or omit a given act." *Neglect*, *Black's Law Dictionary* (6th ed. 1990); *State v. Goodwin*, No. M2022-00540-CCA-R3-CD, 2023 WL 7324497, at *38 (Tenn. Crim. App. Nov. 7, 2023) ("This court has repeatedly held that the common understanding of 'neglect' is 'to ignore or disregard' or 'to fail to care for or attend to sufficiently or properly.'" (cleaned up)), *no perm. app. filed*.[4]

As the statute makes clear, the neglect of a child must adversely affect the child's health or welfare. Tenn. Code Ann. § 39-15-401(b); *Mateyko*, 53 S.W.3d at 671-72. These effects include, but are not limited to, "adverse effects on the emotional and mental health and welfare of the child, the natural effects of starvation or dehydration, or acts of female genital mutilation[.]" Tenn. Code Ann. § 39-15-401(h). And, of course, the requirement of serious bodily injury to the child in this context

> includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects and acts of female genital mutilation as defined in § 39-13-110.

Tenn. Code Ann. § 39-15-402(c). Where the child is eight years of age or less, the offense of aggravated child neglect is a Class A felony. *Id.* § 39-15-402(b).

In this case, no party disputes that J.H. was in the Defendant's care for over one month before his death and that, as his stepmother, the Defendant had a legal duty to care for him. *See Sherman*, 266 S.W.3d at 404. Before his stay with the Defendant, J.H. lived with Ms. Hunter in Ohio. Immediately before taking him to stay with the Defendant in Tennessee, Ms. Hunter took J.H. to his pediatrician, and J.H. did not have any concerning injuries at that time. However, after his death, it was discovered that J.H. had several

---

[4] In interpreting statutory language, we look to the natural and ordinary meaning and ask "how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." *Williams v. Smyrna Residential, LLC*, 685 S.W.3d 718, 723 (Tenn. 2024) (citation and internal quotation marks omitted). In this task, we may consult "authoritative dictionaries published around the time of a statute's enactment." *State v. Deberry*, 651 S.W.3d 918, 925 (Tenn. 2022). Although the courts have looked to several different dictionaries, our supreme court has often looked to the sixth edition of *Black's Law Dictionary,* published in 1990, to construe our criminal statutes first enacted at that time. *See, e.g.*, *State v. Perry*, 656 S.W.3d 116, 128 (Tenn. 2022); *Deberry*, 651 S.W.3d at 927. As such, we do so here.

11

injuries that were inflicted in the weeks before the fatal strike to his head. In fact, the medical examiner attributed these injuries as a contributory cause of death. Specifically, during the autopsy, he discovered various scars, healing burns, and healing rib fractures, and the age of these injuries indicated that J.H. was abused by someone before his death. The medical examiner further testified that the injuries, at the very least, would have justified a visit to a medical professional. Yet, it is undisputed that the Defendant failed to seek help from a medical professional for any of J.H.'s injuries, except for the final one.

The Defendant does not challenge any particular element of her convictions. Instead, the Defendant asserts that the State erroneously linked the brain injury to the two separate offenses of aggravated child abuse and aggravated child neglect, and as such, one of them must be vacated. Specifically, during the closing argument, the State told the jury, "If you find them guilty of count four, aggravated child neglect, . . . for the brain injury, then the only thing you have to find for count two is that [J.H.] died from the course of that neglect." The Defendant argues that the State also connected the brain injury to the separate offense of Count 3 aggravated child abuse and, therefore, there was no separate and apart injury caused by the neglect. In response, the State argues that the evidence was legally sufficient to support the Defendant's convictions.

Importantly, the State specifically noted in its closing argument and bill of particulars that the aggravated child neglect in Count 4 was an *alternate* theory to the aggravated child abuse in Count 3. Thus, the child abuse allegations in Count 3 proceeded under a theory that the Defendant intentionally inflicted the blunt force trauma to J.H.'s head. Alternatively, the child neglect allegations in Count 4 proceeded under a theory that the Defendant ignored J.H.'s pattern of significantly injuring himself and that this neglect led to his fatal head injury. We address both alternative theories in turn.

First, the evidence is legally sufficient to support the Defendant's conviction for aggravated child abuse in Count 3. The medical examiner testified that the constellation of injuries leading up to December 7 allowed him to deduce that the blunt force trauma to the head was intentional and not an accident. He also testified that J.H. died from a lack of oxygen to the brain after the blunt force injury to his head. Viewing this evidence in the light most favorable to the State, we conclude that a rational juror could find that the Defendant intentionally inflicted the blunt force trauma to J.H.'s head, resulting in the child's death.

Second, the evidence is also legally sufficient to support the Defendant's conviction for aggravated child neglect as alleged in Count 4. At trial, the State described Count 4 as an alternative to its prior child abuse theory. The Defendant testified that she knew, or was aware of, multiple falls before December 7, including the three incidents where J.H. fell before December 7. For example, she referred to a time when she heard a "boom" and found J.H. in the tub, holding his head, and she knew he had slipped. Indeed, she further

stated that "the way of the sound that he hit his head, he hit pretty hard," but she never sought medical treatment. The following day, he woke up with a black eye. She still did not seek medical treatment. Another time, she "lotion[ed] him down" and left him alone in the bathroom. She heard a thud and surmised that he had fallen again. Next, three days before the fatal head injury, she described J.H. falling and hitting his head while playing with other children. The Defendant recalled that after this fall, J.H. was acting "like he's drunk, like he's loopy" because he could not even stand up in the shower or stay on the toilet without falling.

After describing the last incident during her testimony, the following exchange occurred:

> [Defense Counsel:] Looking back, knowing now that [J.H.] died two days – well, that he went into cardiac arrest two days later as a result of a severe brain injury, how do you feel about your decision not to take [J.H.] to the doctor after he was staggering and slurring his speech?

> [Defendant:] I wish I did. I wish I took him. I didn't know. I didn't know, but what I know now – if I could turn that time back, I wish I could.

This exchange, in conjunction with the Defendant's testimony, makes it clear that the Defendant knew something was wrong with J.H. yet did not seek medical treatment. She specifically recalled that J.H. was unable to stand on his own and that he was acting loopy, yet she did not seek medical treatment. Instead, she continued to leave him alone with no supervision, as she did on December 7. That day, she left J.H. alone to nap and, once again, heard a loud noise. Upon investigating the noise, she found J.H. unable to stand, grabbing his head, and a clear liquid coming out of his nose and mouth. After she rushed him to the bathroom, J.H. vomited multiple times and went limp. Only at this point did the Defendant *finally* seek the long-needed medical treatment by calling 911.

In this version of events, the Defendant's ongoing neglect continued until December 7 and climaxed with the fatal injury to the head. As such, a reasonable jury could have accepted the Defendant's testimony as true. Therefore, discarding all countervailing evidence, the jury could have found that a failure to seek medical treatment or to investigate further the cause of J.H.'s constant falls through medical treatment or otherwise could have resulted in a blunt force trauma to the head on December 7. As such, this neglect adversely affected J.H.'s health and welfare and ultimately resulted in his death five days later.

Put simply, the State presented two different theories to the jury. The first theory was that the head trauma was intentionally inflicted. The second theory was, alternatively,

that the Defendant was aware that J.H. fell and injured himself multiple times before December 7 and never sought to identify the cause of the falls through medical treatment or otherwise.

The Defendant seems to argue that the jury could not return a guilty verdict for both versions of the events. We respectfully disagree. Even if the verdicts are inconsistent, the supreme court has recognized that "[i]nconsistent verdicts may occur in trials . . . of multiple charges against a single defendant." *State v. Davis*, 466 S.W.3d 49, 72 (Tenn. 2015). Further, "this [c]ourt will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned." *Wiggins v. State*, 498 S.W.2d 92, 94 (Tenn. 1973). As such, we will not attempt to peek behind the curtain of the jury's deliberations.

Viewing the evidence in the light most favorable to the State, as we must, a rational juror could find that the Defendant knowingly neglected the victim, which adversely affected his health and welfare and subsequently resulted in serious bodily injury, including burns, rib fractures, brain injuries, and, ultimately, his death. A rational juror could also find that the death of J.H. occurred during and because of this constant neglect and that his death was closely connected to the neglect in time, place, causation, and continuity of action. We, therefore, conclude that the proof is legally sufficient to support the Defendant's convictions for the first degree felony murder and the aggravated child neglect of J.H.

### B.    EXPERT TESTIMONY

The Defendant next argues that the trial court erred when it allowed Dr. Deering to testify about battered child syndrome because it did not ensure that his testimony was based upon scientific methods, processes, and data. Specifically, the Defendant claims that the trial court abused its discretion by applying an incorrect legal standard when deciding the admissibility of Dr. Deering's testimony. The State responds that the trial court properly admitted expert testimony on the cause and manner of death, including battered child syndrome. We agree with the State.

### 1.    Background

Before trial, the trial court held a hearing to determine whether Dr. Thomas Deering, the Deputy Chief Medical Examiner for Davidson County, could testify that J.H.'s injuries demonstrated a pattern consistent with battered child syndrome. Dr. Deering conducted J.H.'s autopsy and concluded that he died from a lack of oxygen to the brain after a blunt-force injury to the head. In addition to this, Dr. Deering determined that a contributing cause of death was also various scars, burns, and fractures, which he called "multimodality

14

trauma." Dr. Deering opined that the combination of J.H.'s injuries, with some being older and some being recent, formed a pattern that he diagnosed as battered child syndrome.

Dr. Deering testified that medical personnel created battered child syndrome to assist in reporting more cases of child abuse. Specifically, medical personnel learned what to look for when evaluating cases of potential child abuse or neglect. If medical personnel diagnosed a patient with battered child syndrome, they would have to report the case to the Department of Children's Services.

To explain his diagnosis in J.H.'s case, Dr. Deering first noted that there were several scars with various patterns on J.H. in unusual places, indicating the possibility of cigarette burns and the use of a belt or wire. J.H. also had healing burns in several places on his body. When informed of the Defendant's explanation that J.H. was cleaning with bleach for those burns, Dr. Deering determined that the appearance of the burns was not consistent with the Defendant's story. Due to the age of these wounds, Dr. Deering believed it indicated that J.H. had been abused; however, he noted that the wounds were not fatal. Additionally, Dr. Deering observed that J.H. had a swollen, bruised eye and several brain injuries.

Of significant note to Dr. Deering, he discovered at the autopsy that J.H. had healing rib fractures. He testified that J.H. would have been in pain with noticeable symptoms and that there was no history to suggest J.H. "ever got hurt" or received any medical care.

Dr. Deering testified that the previous injuries were all inflicted within a two-month window and were different forms of trauma, which stood out as "highly suspicious." After analyzing all the injuries and wounds, Dr. Deering believed that someone had abused J.H. and that he could not testify at trial about how he determined the cause of death without discussing battered child syndrome.

The trial court allowed Dr. Deering to testify about battered child syndrome during the trial. In making this determination, the trial court analyzed Tennessee Rules of Evidence Rules 702 and 703 and various case law cited by the State. The court held that the diagnosis of battered child syndrome was well-accepted in the medical community. As such, the Rules of Evidence did not prohibit Dr. Deering's testimony about battered child syndrome.

## 2. Standard of Appellate Review

A trial court's decision regarding the "admissibility, qualifications, relevancy and competency of expert testimony" is subject to review under an abuse of discretion standard. *State v. Watkins*, 648 S.W.3d 235, 260 (Tenn. Crim. App. 2021) (quoting *McDaniel v. CSX*

*Transp., Inc.*, 955 S.W.2d 257, 263 (Tenn. 1997)). Our supreme court has emphasized that "[d]iscretionary decisions must take the applicable law and relevant facts into account." *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008). To that end, "an abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision." *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (citation and internal quotation marks omitted). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Moore v. Lee*, 644 S.W.3d 59, 63 (Tenn. 2022) (citation and internal quotation marks omitted).

### 3.      Admission of Dr. Deering's Opinions

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007). More specifically, Rule 702 addresses "when expert testimony is needed and the expert's qualifications." *State v. Davidson*, 509 S.W.3d 156, 207 (Tenn. 2016). Rule 703 "focuses on [the] reliability of expert testimony." *Id.*

Our supreme court has consistently acknowledged that

> [t]rial courts act as gatekeepers when it comes to the admissibility of expert testimony. Their role is to ensure that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*State v. Scott*, 275 S.W.3d 395, 401-02 (Tenn. 2009) (citation and internal quotation marks omitted)). As such, the trial court "must determine that the expert testimony is reliable in that the evidence will substantially assist the trier of fact to determine a fact in issue and that the underlying facts and data appear to be trustworthy." *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 274 (Tenn. 2005).

In applying these standards, our jurisprudence sometimes characterizes the overall framework for the admission of expert testimony in different terms. For example, in *Scott*, our supreme court recognized "four general inter-related components" for the reliability analysis: "(1) qualifications assessment, (2) analytical cohesion, (3) methodological reliability, and (4) foundational reliability." *Scott*, 275 S.W.3d at 402. In other cases, the supreme court has noted that, assuming the testimony is relevant and helpful to the trier of

fact, the admission of expert testimony essentially involves three steps. In *State v. Ferrell*, 277 S.W.3d 372, 378 (Tenn. 2009), for example, the supreme court recognized,

> As a threshold issue, the trial judge must first consider whether a witness qualifies by knowledge, skill, experience, training, or education to offer an opinion within the area of his or her expertise. If the expert is so qualified, the trial judge must then analyze the science and not merely the qualifications, demeanor or conclusions of experts. When those two criteria are met, it is only when there is too great an analytical gap between the data and the opinion proffered, that the evidence may be excluded.

(citation and internal quotation marks omitted). Importantly, though, these different descriptions are merely variations on the essential theme: "the reliability of the testimony and whether it provides substantial assistance to the jury serve as the essential guidelines for the determination of admissibility." *Payne v. CSX Transp., Inc.*, 467 S.W.3d 413, 455 (Tenn. 2015). Using these frameworks, we conclude that the trial court acted within its discretion in admitting Dr. Deering's testimony as to the cause and manner of J.H.'s death.

### a. Relevance

After determining whether the witness was qualified to testify as an expert, the next step in the analysis is to determine whether the expert's opinion is relevant and helpful to the trier of fact. *See State v. Bonds*, 502 S.W.3d 118, 141 (Tenn. Crim. App. 2016) ("Additionally, an expert witness's testimony must be relevant to the issues at trial."). Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.

In this case, Dr. Deering offered an expert opinion on the cause and manner of J.H.'s death. As part of that opinion, he testified that the cause of death was hypoxic/anoxic encephalopathy, or the brain not receiving sufficient oxygen following a blunt force injury to the head. According to Dr. Deering, battered child syndrome refers to a series or pattern of injuries that suggest child abuse, rather than accidental harm, due to the type and unexplained nature of the injuries sustained by the child. *See also State v. Patlan*, No. M2011-01175-CCA-RM-CD, 2011 WL 2848395, at *15 (Tenn. Crim. App. July 18, 2011) (describing battered child syndrome as being "a medical diagnosis used to describe a child who has been subjected to repeated bouts of severe physical child abuse."), *no perm. app. filed*; *see also Estelle v. McGuire*, 502 U.S. 62, 66 (1991) (defining battered child syndrome as "[the] syndrome [that] exists when a child has sustained repeated and/or serious injuries by nonaccidental means."). Dr. Deering further opined that the manner of death was a

17

homicide, and he offered this testimony as part of a larger opinion that the December 7 injury suffered by J.H. was not the result of an accident but was "probably inflicted."

The trial court found that "the prior injury evidence" was "relevant to whether these injuries were due to accidents or were inflicted intentionally." We agree. The United States Supreme Court has recognized that "evidence demonstrating battered child syndrome helps to prove that the child died at the hands of another and not by falling off a couch, for example; it also tends to establish that the 'other,' whoever it may be, inflicted the injuries intentionally." *Estelle*, 502 U.S. at 68. The trial court acted within its discretion in finding that if Dr. Deering was properly qualified as an expert and his opinion was sufficiently reliable and demonstrated analytical cohesion, then his opinion about the cause and manner of J.H.'s death was relevant evidence for the jury's consideration. *See* Tenn. R. Evid. 402, 702.

### b.        The Expert's Qualifications

The next step was for the trial court to determine whether Dr. Deering was qualified by knowledge, skill, experience, training, or education to offer an opinion within the area of his expertise. *See* Tenn. R. Evid. 702. Without objection, the State tendered Dr. Deering as an expert in forensic pathology. He testified that he worked in "medical examining or forensic pathology" for about twenty-five years in Memphis and Nashville. Among other things, he stated that he had a medical degree from the University of Iowa and a residency in pathology. He estimated that he had personally performed more than 5,000 autopsies, and he confirmed that he had been previously admitted as an expert in forensic pathology in other cases as well. The trial court acted within its discretion in finding that Dr. Deering was qualified by knowledge, skill, experience, training, and education to offer an opinion within the field of forensic pathology.

### c.        Foundational Reliability of the Expert's Field of Expertise

The next inquiry is whether the field of Dr. Deering's expertise was sufficiently reliable, both in terms of methodological and foundational reliability, to enable him to offer an opinion. *Scott*, 275 S.W.3d at 402. As Dr. Deering defined the field of his expertise, "[P]athology studies a lot of things. From surgical pathology to what happens in a laboratory is kind of the area of pathology. And forensic is a word that means legal. So there are times when a death has legal implications[.]" He stated that he seeks to identify "the cause of death of an individual" and "the manner of death."

In this context, Dr. Deering explained that the "cause of death" is a conclusion based on the circumstances and the physical examination of the body. For example, he noted that the cause of death could include natural diseases, environmental conditions, trauma,

gunshot wounds, and blunt force injuries. In this case, Dr. Deering concluded that the cause of J.H.'s death was hypoxic/anoxic encephalopathy, or the brain not receiving sufficient oxygen following a blunt force injury to the head. However, Dr. Deering also testified that a contributing cause of death was battered child syndrome or battered child appearance. This contributing cause of death helped him to identify the manner of death as a homicide, as he believed that the injuries to J.H. on December 7 were inflicted injuries and not accidental. It is with this conclusion that the Defendant takes issue.

The Defendant asserts that the trial court erred in allowing testimony about battered child syndrome, arguing that the trial court did not apply the appropriate factors under *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997), to determine the reliability of testimony about battered child syndrome. We respectfully disagree.

Our supreme court has clarified that trial courts must assess "the expert's field or discipline by focusing on the reliability of the studies, articles, and data that compose the field and provide the underlying foundation for the expert's testimony." *Davidson*, 509 S.W.3d at 211 (citing *Scott*, 275 S.W.3d at 402-03). As part of this assessment, the trial court may consider several nonexclusive factors as identified by our supreme court in *McDaniel*:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*McDaniel*, 955 S.W.2d at 265. Importantly, however, these factors are "not requirements for [the] admissibility" of an expert opinion. *Davidson*, 509 S.W.3d at 208. Indeed, individual factors may not even "fit" in a particular case. *Scott*, 275 S.W.3d at 404. As such, applying the *McDaniel* factors to assess reliability depends upon the nature of the issue, the witness's particular expertise, and the subject of the expert's testimony. *Brown*, 181 S.W.3d at 277.

In this case, the trial court focused on the fourth *McDaniel* factor when admitting Dr. Deering's testimony, finding that it was a "well-accepted diagnosis in the medical community." This was certainly an appropriate consideration and one that is supported in our case law. For example, our trial courts have admitted evidence of battered child syndrome for nearly five decades. *See, e.g.*, *Dorantes*, 331 S.W.3d at 376 (affirming convictions for aggravated child abuse and felony murder by aggravated child abuse; proof at trial involved testimony by the medical examiner classifying the cause of death as

battered child syndrome); *Hawkins v. State*, 555 S.W.2d 876, 876 (Tenn. Crim. App. 1977) (affirming a conviction for second degree murder; the State's theory at trial involved the child dying as a result of battered child syndrome); *State v. Taylor*, No. M2015-02142-CCA-R3-CD, 2017 WL 2179952, at *12 (Tenn. Crim. App. May 16, 2017) (affirming a conviction for reckless homicide; proof at trial involved the medical examiner classifying the circumstances of the victim's death as being battered child syndrome), *perm. app. denied* (Tenn. Sept. 21, 2017); *State v. Mark*, No. M2014-00651-CCA-R3-CD, 2015 WL 4720038, at *21 (Tenn. Crim. App. Aug. 10, 2015) (affirming convictions for felony murder and aggravated child abuse; proof at trial included testimony by a forensic pathologist, Dr. Deering, that "[t]he pattern of the chronic injuries with the now fatal acute injury to the brain suggests a pattern of ongoing child abuse, battered child syndrome"), *perm. app. denied* (Tenn. Dec. 10, 2015); *State v. Branam*, No. E2014-01345-CCA-R3-CD, 2015 WL 4594158, at *18 (Tenn. Crim. App. July 31, 2015) (affirming convictions for aggravated child abuse and felony murder; proof at trial included medical examiner's expert testimony that the child was a "victim of battered child syndrome and the manner of [her] death was homicide"), *perm. app. denied* (Tenn. Feb. 14, 2018); *State v. Mathis*, No. M2009-00123-CCA-R3-CD, 2012 WL 4461767, at *28 (Tenn. Crim. App. Sept. 26, 2012) (affirming convictions for felony murder, aggravated child abuse, and aggravated child neglect; proof at trial included testimony from a forensic pathologist that the victim suffered from battered child syndrome and ultimately died from strangulation), *perm. app. denied* (Tenn. Feb. 25, 2013); *Patlan*, 2011 WL 2848395, at *15 (affirming convictions for aggravated child abuse and felony murder during the perpetration of aggravated child abuse; proof at trial established that cause of death was battered child syndrome, defined as "a medical diagnosis used to describe a child who has been subjected to repeated bouts of severe physical child abuse") (internal quotation marks omitted); *State v. Maze*, No. M2004-02091-CCA-R3-CD, 2006 WL 1132083, at *4 (Tenn. Crim. App. Apr. 28, 2006) (affirming convictions for felony murder and aggravated child abuse; proof at trial involved expert testimony diagnosing the victim with battered child syndrome which "is a recognized [medical] diagnosis that can actually be coded for billing and insurance purposes"), *perm. app. denied* (Tenn. Aug. 28, 2006); *State v. Wester*, No. E2004-02429-CCA-R3-CD, 2006 WL 304700, at *5 (Tenn. Crim. App. Feb. 9, 2006) (affirming a conviction for felony murder in the perpetration of aggravated child abuse; proof at trial involved the Chief Medical Examiner of Tennessee testifying that the victim suffered from battered child syndrome), *perm. app. denied* (Tenn. June 26, 2006); *State v. Toporan*, No. M2004-00561-CCA-R3-CD, 2005 WL 2255692, at *4 (Tenn. Crim. App. Aug. 24, 2005) (affirming convictions for felony murder and aggravated child abuse; proof at trial involved testimony by the Chief Medical Examiner for Tennessee that the victim's cause of death was "due to multiple blunt force injuries and that the manner of death was homicide under the circumstances of being a battered child"), *no perm. app. filed*; *State v. Pipes*, No. 02C01-9410-CC-00222, 1995 WL 146125, at *2 (Tenn. Crim. App. Apr. 5, 1995) (affirming a conviction for aggravated child abuse; proof at trial included a medical diagnosis of the child with battered child syndrome), *perm. app. denied* (Tenn. July 3, 1995).

In addition, the United States Supreme Court has recognized the admissibility of testimony related to battered child syndrome evidence "when a child has sustained repeated and/or serious injuries by nonaccidental means." *Estelle*, 502 U.S. at 66. And courts in our sister states have also long affirmed admission of expert testimony in this field. For example, some twenty-five years ago, the Kansas Supreme Court recognized that "battered child syndrome has gained wide judicial acceptance and is not novel scientific evidence[.]" *State v. Heath*, 957 P.2d 449, 465 (Kan. 1998) (citing cases). Twenty years before that, the North Carolina Supreme Court recognized that "[a]s far as our research reveals, all courts which have considered the question, including our own Court of Appeals, have concluded that such expert medical testimony concerning the battered child syndrome as was offered in this case is properly admitted into evidence." *State v. Wilkerson*, 247 S.E.2d 905, 912 (N.C. 1978). More recently, admission of battered child syndrome testimony has been described as "well-settled law" when offered "to refute a claim of accidental death." *Cardona v. State*, 299 So. 3d 1142, 1145 (Fla. Dist. Ct. App. 2020); *see also State v. Martinez*, 68 P.3d 606, 616-17 (Haw. 2003) ("[E]vidence of [battered child syndrome] is admissible in a trial in which a defendant is charged with an offense implicating the breach of a legal duty to seek and obtain timely medical treatment for an injured child in order to prove that the child's injury was not accidental, regardless of whether the prosecution is able to link the child's prior injuries directly to the defendant.").

As we noted above, the *McDaniel* factors are not requirements, and the trial court need not consider all of the factors in determining the reliability of the expert's field of expertise or discipline. This may be particularly true when courts in Tennessee and other jurisdictions have widely accepted the field or discipline. *Cf. Davidson*, 509 S.W.3d at 211-12 (finding testimony about the ACE-V methodology for fingerprinting to be sufficiently reliable against a challenge to the methodology when the method "has been widely accepted by courts," even without proof supporting other *McDaniel* factors). We conclude that the trial court properly found that testimony in the field of battered child syndrome possessed sufficient reliability to be considered by the jury.

### d. Methodological Reliability and Analytical Cohesion of Dr. Deering's Opinion

Finally, we examine whether Dr. Deering's opinion about the cause and manner of death was analytically cohesive and whether there was a significant analytical gap between his opinion and the data upon which it was based. *See Davidson*, 509 S.W.3d at 210. As the supreme court has recognized, a trial court "may conclude that an expert's opinions are reliable if the expert's conclusions are sufficiently straightforward and supported by a rational explanation which reasonable [persons] could accept as more correct than not

correct." *Brown*, 181 S.W.3d at 275 (citation and internal quotation marks omitted; alteration in original).

The Defendant argues that Dr. Deering's opinion was based on speculation about the nature of J.H.'s prior injuries. More specifically, the Defendant asserts that Dr. Deering speculated when he testified that the wounds on J.H.'s hands showed a splash pattern. He also claims that the expert further speculated about the source of the circular scars on J.H. In essence, we understand this argument to assert that too great an analytical gap existed between Dr. Deering's conclusion that J.H.'s injuries were inflicted and the facts (or data) he relied upon to reach that conclusion.

We respectfully disagree that Dr. Deering's opinions as to the cause and manner of death were mere speculation. Dr. Deering testified in detail as to his observations, the lack of any reasonable explanation given for the injuries that J.H. suffered, and the inexplicable absence of medical care for injuries that would have been painful to J.H.

With respect to the splash pattern, Dr. Deering testified that the "pattern" was unusual and that the burns varied in depth. He stated that the location of the chemical burns did not "match" the explanation he was given, which was that J.H. had an allergic reaction after using a bleach cleaner and that it appeared to him as though the chemical burns on each hand happened at different times. He also testified that he had not seen this type of injury previously from a child cleaning with bleach.

Regarding the circular scars, Dr. Deering testified that he did not definitively know the source of the scars. But he testified that he saw healed blistered skin on the tips of J.H.'s fingers and toes. He also believed that other scars were healed burns. Dr. Deering noted that, while he could not say conclusively, the small circular scars on J.H.'s back appeared to be cigarette burns, given their appearance and location.

Although Dr. Deering could not definitively identify the source of these scars, this inability did not render his opinion as to the cause and manner of death so speculative as to be unreliable or unhelpful to the jury. It was not. On the contrary, the expert explained that his testimony was based on his training in forensic pathology and his experience and observations in other cases. From this training and experience, he believed that the scars were found in places that were not typical for accidents, and he had no information showing any "other reasonable mechanism to explain [the scars]." Moreover, he offered his observations as to these scars in the context of other injuries, such as rib fractures, that also occurred in the absence of any medical treatment or credible information as to the causes.

Thus, from his education, experience, and observations, Dr. Deering testified that, to a degree of medical certainty, the head injury suffered by J.H. on December 7 was

inflicted and was not accidental. Notably, Dr. Deering did not opine as to the *mere possibility* of a causal relationship. Instead, he identified the most likely cause of the head injury and gave a "rational explanation which reasonable [persons] could accept as more correct than not correct." *Brown*, 181 S.W.3d at 275. Thus, the trial court was "entitled to admit the opinion and leave its weight to the jury." *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 862 (Tenn. 1985) (citations omitted); *State v. Cannon*, 642 S.W.3d 401, 441 (Tenn. Crim. App. 2021) ("Any deficiencies in the theory, methodology, or application can be explored on cross-examination, and the jury can then give the opinion whatever weight it deems appropriate."). We conclude that the trial court acted within its discretion in admitting the evidence for the jury to consider.

### 4. Expert's Testimony as to Injuries Generally Caused by Falls

In a related argument, the Defendant asserts that the trial court erred in allowing Dr. Deering to testify about the relationship between falls and injuries. More specifically, the Defendant takes issue with the following testimony offered by the expert, asserting that the testimony as to the ratio of injuries to deaths is speculative:

> This is child abuse to me. These old injuries that didn't -- didn't themselves, in his death, point me to look at that last event and say I don't think it's an accident. I think it's inflicted. It would be important to know that kids fall all the time. Kids fall and hit their head[s] all the time. And maybe one in a million of those falls dies. So a kid – if the explanation is well, he must have fallen, it's a really rare event and it was quite the fall.

Even if this testimony were objectionable—and in the overall context of the expert's testimony, we do not so hold—the Defendant did not object when offered at trial. Ordinarily, before a party can challenge the admission of evidence on appeal, the party must have preserved the issue in the trial court. "To preserve an issue, the party should first assert a timely objection identifying a specific ground." *State v. Thompson*, No. W2022-01535-CCA-R3-CD, 2023 WL 4552193, at *3 (Tenn. Crim. App. July 14, 2023), *no perm. app. filed.*

Because the Defendant did not raise an objection in the trial court based on this testimony, we conclude that the Defendant has waived plenary review of this issue on appeal. *See State v. Dotson*, 450 S.W.3d 1, 95 (Tenn. 2014). Moreover, because the Defendant does not request review of this issue for plain error, we respectfully decline to address the issue sua sponte. *See State v. Funk*, No. E2022-01367-CCA-R3-CD, 2023 WL 7130289, at *2 (Tenn. Crim. App. Oct. 30, 2023), *no perm. app. filed*. The Defendant is not entitled to relief.

## 5. Trial Court's Pretrial Assessment of the Evidence

The Defendant makes one final argument on this issue, claiming that the trial court erred by allowing the admission of the expert testimony following an erroneous assessment of the evidence supporting the opinion. More specifically, she asserts that the court erroneously found that Dr. Deering believed all of J.H.'s injuries were caused in the two months before December 2016. From this, she argues that because the expert's testimony did not support the trial court's findings, the expert's testimony was inadmissible. In response, the State argues that the Defendant is confusing "injuries" with "marks" and "scars," which could not be dated, and therefore, the trial court's findings of facts are not erroneous. We agree with the State.

The trial court issued a written order concerning Dr. Deering's testimony. In the order, it made several findings of fact. Among those findings, the court found that "Dr. Deering is of the opinion that the injuries found on the victim were caused within the two months prior to his admittance to the hospital in December of 2016." Another finding was that "[t]here are pediatric records reflecting the child did not have any injuries prior to leaving Ohio in September of 2016."

These findings were consistent with the testimony offered by Dr. Deering in the pretrial hearing. During that testimony, Dr. Deering distinguished between "injuries" on the one hand and scars and marks on the other. When he referred to J.H.'s "injuries," the expert referred generally to the healed rib fractures that occurred, in his view, some four to six weeks before J.H.'s death. When he discussed other evidence of abuse to J.H., such as the "numerous scars," the expert did not definitively date these marks, and he did not refer to them as "injuries."

Dr. Deering's testimony fully supports the trial court's findings that no injuries, such as rib fractures, existed before September 2016. The court simply did not conclude, as the Defendant suggests, that "all injuries," defined as bone fractures, scars, and marks, occurred between September and December 2016. More importantly, even if the findings were as the Defendant believes them to be—and they are not—they are not sufficiently material in light of the trial testimony to reveal an abuse of discretion. We conclude that Dr. Deering's expert testimony related to the cause and manner of J.H.'s death and that it was admissible for the jury to consider for whatever weight it believed appropriate.

## C.     SEVERANCE OF OFFENSES

### 1.     Background

The Defendant next argues that two counts of aggravated child neglect, Counts 9 and 10, should have been severed from the remainder of the offenses and tried separately. As background for this issue, the grand jury charged the Defendant with ten offenses grouped into five separate offense dates.[5] The offenses were as follows:

- Count 1 charged the felony murder during the perpetration of or attempt to perpetrate aggravated child abuse, with the predicate offense of aggravated child abuse charged in Count 3. Count 1 had an offense date of December 12, 2016, which was the date of J.H.'s death, and Count 3 had an offense date of December 7, 2016, which was the date of the fatal blow to J.H.'s head.

- Count 2 also charged the felony murder during the perpetration of or attempt to perpetrate aggravated child neglect, with the predicate offense of aggravated child neglect charged in Count 4. As before, Count 2 had an offense date of December 12, 2016, which was the date of J.H.'s death, and Count 4 had an offense date of December 7, 2016, which was the date of the fatal blow to J.H.'s head.

- Counts 5 and 6 charged aggravated child abuse and aggravated child neglect with an offense date of November 25, 2016. In its bill of particulars, the State specified that these counts referred to injuries to J.H.'s "left cheek, left nasal bone fracture, and associated injuries." Count 6 was noted as an alternate theory to Count 5, citing that the Defendant failed to seek proper treatment for the injuries.

- Counts 7 and 8 also charged aggravated child abuse and aggravated child neglect but with an offense date between September 28, 2016, and December 1, 2016. The State specified that these counts referred to J.H.'s healing rib fractures. Count 8 was noted as an alternate theory to Count 7, again charging that the Defendant failed to seek proper treatment for these injuries.

---

[5]     Originally, the State charged the Defendant with one count of felony murder committed during the commission of aggravated child abuse that was later dismissed. The State issued a superseding indictment that charged ten offenses, as discussed here.

- Counts 9 and 10 charged alternative theories of aggravated child neglect with the offense date as a continuing course of conduct between September 28, 2016, and December 7, 2016. In its bill of particulars, the State specified that these counts included "head injuries, broken ribs, severe and painful burns to the victim's hands, feet and other parts of his body[.]" Count 9 referred to the Defendant's failure to seek proper medical treatment. Count 10 was an alternate theory to Count 9, alleging that the Defendant's conduct amounted to especially heinous conduct, atrocious or cruel conduct, and the infliction of torture.

Before trial, the Defendant filed a motion to sever the offenses. At a pretrial hearing, she requested that the trial court sever the offenses based on their separate offense dates.[6] Specifically, she asked the trial court to conduct separate trials for Counts 1 through 4; Counts 5 and 6; Counts 7 and 8; and Counts 9 and 10.

At the hearing, the parties did not present any proof apart from incorporating Dr. Deering's prior testimony into the hearing. The Defendant argued that the various offenses were not part of the same criminal transaction and should be severed. She further asserted that Counts 9 and 10 should be severed from Counts 1 through 4 because the ongoing failure to provide treatment did not apply to J.H.'s fatal head injury. The State maintained that Counts 9 and 10 were continuing offenses and should not be severed.

The trial court issued an order severing the offenses in the groupings as requested by the Defendant, finding that there was no common scheme or plan, no conspiracy, and that the offenses did not occur in the same criminal episode. However, the court permitted the State to combine Counts 9 and 10 with any of the severed groups because they alleged neglect that covered the entire period of the ongoing abuse. The State elected to try Counts 9 and 10 with Counts 1 through 4, which are the subject of this appeal.[7]

---

[6]     The Defendant filed a written motion requesting the trial court sever counts 1 through 4 from the rest of the offenses. However, this was filed prior to the State's bill of particulars. After receiving the bill of particulars, the Defendant modified her request at the pre-trial hearing on the matter. At the hearing, the Defendant asked the trial court to separate the charges by their respective offense dates into four different sets. As such, we consider the Defendant's amended request to sever the charges by the offense date.

[7]     With the agreement of the parties, the trial court renumbered Counts 9 and 10 as Counts 5 and 6 before submitting them to the jury. This was a permissible procedure to ensure that the jury was unaware of other criminal offenses with which the Defendant was originally charged. *See State v. Thompkins*, No. E2023-00209-CCA-R3-CD, 2023 WL 8112826, at *1 n.2 (Tenn. Crim. App. Nov. 21, 2023), *no perm. app. filed*. However, because of the complex procedural history of this case, we use the enumeration of the counts as designated by the grand jury.

## 2. Standard of Appellate Review

"We review decisions concerning permissive joinder and severance of offenses pursuant to [Tennessee] Rules of Criminal Procedure 8(b) and 14(b)(1) for an abuse of discretion." *Spicer v. State*, 12 S.W.3d 438, 442 (Tenn. 2000) (citing *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). "As such, a trial court's decision to consolidate or sever offenses will not be reversed unless the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *Id.* (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997) (citations and internal quotation marks omitted)).

## 3. Severance of Offenses

The Defendant vigorously attacks the State's elected joinder of Counts 9 and 10 with Counts 1 through 4 for a consolidated trial. The Defendant claims there were no grounds under Rule 14 to establish a common scheme or plan and that even if a common scheme or plan had been established, the trial court did not make the proper findings under Rule 404(b) to consolidate the trial. The State argues that the consolidation was appropriate because the offenses were part of the same criminal transaction. It further argues, though, that any error would have been harmless.

Decisions concerning the joinder and severance of offenses are governed by Rules 8(b) and 14(b)(1) of the Tennessee Rules of Criminal Procedure. *Shirley*, 6 S.W.3d at 247. "To consolidate separate indictments under Rule 8(b), the state needs only to show that the offenses are parts of a common scheme or plan or that the offenses are of the same or similar character." *Spicer*, 12 S.W.3d at 443 (internal quotation marks omitted). On the other hand, "a defendant has a right under Rule 14(b)(1) to a severance of offenses permissively joined, unless the offenses are parts of a common scheme or plan and the evidence of one offense would be admissible upon the trial of the others." *Id.* (internal quotation marks omitted). "Upon the defendant's motion to sever permissibly joined offenses, the State bears the burden of establishing both prongs." *State v. Eady*, 685 S.W.3d 689, 709 (Tenn. 2024). Importantly, "[t]he primary inquiry into whether a severance should have been granted under Rule 14 is whether the evidence of one crime would be admissible in the trial of the other if the two counts of the indictment had been severed." *State v. Burchfield*, 664 S.W.2d 284, 286 (Tenn. 1984).

Errors in severance are analyzed under the harmless error standard. *Eady*, 685 S.W.3d at 715. Under this standard, relief is only warranted if the error "more probably than not affected the judgment or would result in prejudice to the judicial process." *State v. Rodriguez*, 254 S.W.3d 361, 374 (Tenn. 2008). As our supreme court has recognized, "We often have observed that the line between harmless and prejudicial error is in direct

27

proportion to the degree by which proof exceeds the standard required to convict." *Eady*, 685 S.W.3d at 715 (citing *State v. Denton*, 149 S.W.3d 1, 15 (Tenn. 2004)). Thus,

> when looking to the effect of an error on the trial, we will evaluate that error in light of all of the other proof introduced at trial. The more the proof exceeds that which is necessary to support a finding of guilt beyond a reasonable doubt, the less likely it becomes that an error affirmatively affected the outcome of the trial on its merits.

*State v. Gilliland*, 22 S.W.3d 266, 274 (Tenn. 2000). Ultimately, "[t]he key question is whether the error likely had an injurious effect on the jury's decision-making process. If the answer is yes, the error cannot be harmless." *State v. Brown*, No. M2017-00904-CCA-R3-CD, 2019 WL 1514551, at *30 (Tenn. Crim. App. Apr. 8, 2019) (citing *State v. Dotson*, 254 S.W.3d 378, 389 (Tenn. 2008)), *perm. app. denied* (Tenn. Aug. 15, 2019).

Additionally, evidence involving prior acts is often admitted for the non-propensity purposes of providing necessary contextual background. *State v. Reynolds*, 635 S.W.3d 893, 921 (Tenn. 2021). Indeed, "[e]vents do not occur in a vacuum, and in many cases, knowledge of the events surrounding the commission of the crime may be necessary for the jury to realistically evaluate the evidence." *Gilliland*, 22 S.W.3d at 272 (citation and internal quotation marks omitted). Nevertheless, when contextual background evidence consists of a defendant's other acts, the evidence may be offered only when "exclusion of that evidence would create a chronological or conceptual void in the presentation of the case and that void would likely result in significant jury confusion concerning the material issues or evidence in the case." *Id.* Under these circumstances, background evidence can certainly be admissible to "complete the story" for the jury, so long as the danger of unfair prejudice does not outweigh its probative value. *Reynolds*, 635 S.W.3d at 903.

Even if the consolidation of Counts 9 and 10 with Counts 1 through 4 was an error—and we make no such finding—we agree with the State that it had no injurious effect on the jury's decision-making process. As discussed above, Dr. Deering's testimony concerning the prior scars, marks, and injuries would have been relevant and introduced regardless of whether Counts 9 and 10 were tried with Counts 1 through 4. Dr. Deering's testimony was crucial to an essential element of the felony murder and predicate felony counts, as it established the manner of death.

Further, the evidence in Counts 9 and 10 would have been admissible as contextual background in Counts 1 through 4 and vice versa. The evidence in Counts 9 and 10 consisted of the previous scars, marks, and injuries to J.H. that occurred in the two months he was in the Defendant's care. This evidence was present in Dr. Deering's autopsy and contributed to Dr. Deering's establishing the manner of death as homicide. The background

of the events forming the basis of Counts 9 and 10 was important, if not essential, to the medical examiner's conclusion that the fatal head blow was intentionally inflicted and not accidental. As such, this evidence generated the felony murder charges and their predicate felonies of aggravated child abuse and aggravated child neglect in Counts 1 through 4.

Conversely, if Counts 9 and 10 were to be tried separately from Counts 1 through 4, then the evidence in Counts 1 through 4 would also be admissible as necessary contextual background evidence in that trial of those later counts. The evidence in Counts 1 through 4 would necessarily be admitted because it would have to be introduced through Dr. Deering's testimony as the medical examiner who performed J.H.'s autopsy. Included in that autopsy would be the fatal blunt force trauma to the head that was inflicted on December 7, which is the offense charged in Counts 1 through 4. For the jury to realistically evaluate the evidence in Counts 9 and 10, it would have been necessary for the jury to know of the discovery of J.H.'s abuse and neglect from Dr. Deering's examination—evidence that was inseparable from that necessary to establish Counts 1 through 4. As such, evidence of the crimes in Counts 1 through 4 would have been necessary contextual background evidence in the trial of Counts 9 and 10.

Accordingly, we conclude that the Defendant has not shown that the trial court's decision to allow the consolidation "more probably than not affected the judgment" or "result[ed] in prejudice to the judicial process." Tenn. R. App. P. 36(b); *Rodriguez*, 254 S.W.3d at 374. The Defendant is not entitled to relief on this issue.

### D.   AUTHENTICATION OF VIDEO EVIDENCE

The Defendant next argues that the trial court erred in holding that the State properly authenticated a video of J.H. that was recorded from a cell phone belonging to a non-testifying third party. The State asserts that the trial court acted within its discretion when it admitted the video of J.H. We agree with the State.

### 1.   Background

During the trial, defense counsel objected to the State introducing the video that the Defendant's daughter initially showed officers during their first visit to the Defendant's home. Detective Miranda Vaughn, the lead detective on the case, testified that approximately one day after J.H. went to the hospital, she learned that the Defendant's daughter had taken a video of J.H. when she was visiting the Defendant over Thanksgiving.

She learned that the daughter showed this video to Officer Rico Jones on November 27, 2016.

To track down the video, Detective Vaughn determined that the initial call to the police came from the daughter's best friend in Minnesota, Nikitta Higgs, who had been sent the video from the Defendant's daughter. Detective Vaughn then went to Minnesota to interview Ms. Higgs and the Defendant's daughter. During these interviews, Detective Vaughn viewed both of their phones and saw the video and messages surrounding it in the Snapchat app. Detective Vaughn could see that the messages occurred on November 25, as they were still in the Snapchat app. Additionally, Ms. Higgs informed Detective Vaughn that she had received the messages and video at 11:43 p.m. on November 25, 2016. Detective Vaughn then recorded the video on a camera. She also took possession of both phones, but the police department in Minnesota could not forensically extract the video.

Detective Vaughn identified J.H. in the video and noticed that he had several marks on his face and back. Further, Detective Vaughn testified that what she saw on the video was consistent with what she saw on J.H. when he was in the hospital. Detective Vaughn then provided the video to Dr. Deering.

The State sought to introduce the video through Detective Vaughn and not through Ms. Higgs or the Defendant's daughter, citing that they were not cooperative. The trial court found that a "reliable foundation" existed to permit the introduction of the video.

### 2. Standard of Appellate Review

We review a trial court's determination that evidence has been properly authenticated for an abuse of discretion. *State v. Mickens*, 123 S.W.3d 355, 376 (Tenn. Crim. App. 2003). "An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is illogical or unreasonable and causes an injustice to the party complaining." *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007) (citation and internal quotation marks omitted); *State v. Murray*, No. M2021-00688-CCA-R3-CD, 2022 WL 17336522, at *6 (Tenn. Crim. App. Nov. 30, 2022) (citation and internal quotation marks omitted), *perm. app. denied* (Tenn. Mar. 8, 2023).

### 3. Authentication

Tennessee Rule of Evidence 901(a) provides that evidence may be authenticated "by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Further, "[a]uthentication can be properly established by the testimony of a witness with knowledge that the 'matter is what it is

claimed to be.'" *Mickens*, 123 S.W.3d at 376 (citing Tenn. R. Evid. 901(b)(1)). As a leading treatise has observed, "[a]uthentication is actually a facet of conditional relevance discussed in rule 104(b)." Neil P. Cohen, et al., *Tennessee Law of Evidence* § 9.01[2][a] (6th ed. 2011) (hereinafter *Tennessee Law of Evidence*). In this process, "[t]he judge looks at the evidence presented by the proponent of the proof and decides whether the jury, if presented with that evidence, could reasonably find that the proffered item is what it is claimed to be." *Id.* Once the evidence is admitted, "the jury, then, is free to give [the evidence] as much or little weight as the jury thinks appropriate." *Id.* § 9.01[2][c]; *State v. Hinton*, 42 S.W.3d 113, 127 (Tenn. Crim. App. 2000).

Specifically regarding the admissibility of videos, "[a] leading treatise has explained that '[v]ideos . . . are authenticated the same way as photographs.'" *State v. Spivey*, No. M2018-00263-CCA-R3-CD, 2020 WL 598347, at *10 (Tenn. Crim. App. Feb. 7, 2020) (quoting *Tennessee Law of Evidence* § 9.01[3][c]), *perm. app. denied* (Tenn. June 3, 2020). Further, "[a] photograph can [be] authenticated by proof that it depicts what it is claimed to depict, Rule 901(a)." *Tennessee Law of Evidence* § 401[21][e] (internal quotation marks omitted). However,

> [i]t is not necessary . . . that the witness through whom a photo is being introduced was also the photographer who took the photo in question. Any person, whether or not the photographer, familiar with the place or item that was photographed can authenticate the picture by testifying that it is a true and accurate depiction of the location or item at issue in the case.

*Id.*

Additionally, we have previously held that a video is admissible even if the testifying party was not present at the scene and does not know when it was taken. *See State v. Glass*, No. E2019-00965-CCA-R3-CD, 2020 WL 3056502, at *8-9 (Tenn. Crim. App. June 9, 2020) (holding that the trial court did not abuse its discretion in admitting video evidence where the testifying officer was not present at the scene and did not clearly know when the video was taken due to an erroneous time stamp), *perm. app. denied* (Tenn. Oct. 7, 2020). Further, "Rule 901 provides that the testimony of a witness with knowledge is but one in a list provided 'by way of illustration only, and not by way of limitation.'" *Id.* (quoting Tenn. R. Evid. 901). "Also included in the illustrative list is the ability to authenticate a matter using 'appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with the circumstances.'" *Id.*

In this case, Detective Vaughn was familiar with J.H.'s appearance. She saw him in person when he was in the hospital and was, therefore, able to identify him in the video. Further, Detective Vaughn testified that the marks she saw on the video were consistent with the marks she saw on J.H. when he was in the hospital.

Additionally, Detective Vaughn saw the date the video was sent to Ms. Higgs, as it was still saved in Snapchat, along with the conversation surrounding the video. While the messages could be inadmissible hearsay in front of a jury, perhaps depending on why they would be offered, they served as important context for the trial court as it considered the admissibility of the evidence. The trial court correctly identified that Tennessee Rule of Evidence 104 permits the court to ask preliminary questions concerning those privileges. In this context, the circumstances surrounding the video were essential to determine its authenticity. Specifically, the Defendant's daughter reached out to Ms. Higgs to express concern for J.H., informing her that "somebody needed to help [J.H.]." To reinforce this concern, she sent the video of J.H., which was consistent with what Detective Vaughn saw in the hospital days later.

Although this is a unique situation, the standard of appellate review is important. Under an abuse of discretion standard, "[t]he reviewing court need not find that the trial court made the best decision or the one the appellate court would have made; instead, the reviewing court must confine itself to determining whether the trial court's decision was within the range of acceptable alternatives." *State v. Willis*, 496 S.W.3d 653, 729 (Tenn. 2016). The trial court's decision here was not illogical or wholly unreasonable, and it was not based on a clearly erroneous assessment of the evidence. *See In re Karissa V.*, No. E2016-00395-COA-R3-PT, 2017 WL 758513, at *13 (Tenn. Ct. App. Feb. 27, 2017), *perm. app. denied* (Tenn. May 24, 2017). As such, when the contents of the video and the surrounding circumstances are taken together, we cannot conclude that the trial court erred in finding that the video was sufficiently authenticated for admission. The Defendant is not entitled to relief on this issue.

### E. SUPPLEMENTAL JURY INSTRUCTION

The Defendant next argues that the trial court improperly gave a supplemental jury instruction in response to a jury question. Specifically, the Defendant asserts that the trial court provided a contradictory and misleading instruction that jeopardized the jury's unanimity and undermined the verdict's integrity. The State concedes this point and agrees that Count 4 should be remanded for a new trial. We agree with the parties.

#### 1. Background

As background for this issue, we note that during the closing argument, the State informed the jury that they could group the counts together. Specifically, the State told the jury that they could group Counts 1 and 3 together as felony murder committed during the perpetration of or attempt to perpetrate aggravated child abuse. As an alternate theory, the State told the jury that they could group Counts 2 and 4 together as felony murder committed during the perpetration of or attempt to perpetrate aggravated child neglect.

However, the State also told the jury that both groupings referred to the blunt force trauma to the head that occurred on December 7. The State further explained that Counts 9 and 10 referred to "the continuing course of conduct of neglect from September 28th of 2016 to December 7th of 2016."

Later, during deliberations, the jury asked whether Count 3 referred to a specific context or event, and the parties agreed that it referred to the blunt force trauma inflicted on December 7. The court instructed the jury of that. The jury then asked whether Count 4 referred specifically to the blunt force trauma inflicted on December 7. Appearing to change its position, the State then argued that it did not have to prove the date of the offense beyond a reasonable doubt, and as such, the jury should not be instructed that Count 4 specifically referred to the head trauma. Defense counsel pointed out that Count 4 seemed to refer to the head trauma and asked the court to instruct the jury to refer to the indictment for further clarification. Instead, the trial court instructed the jury, "No, but refer to the instructions." Defense counsel objected to this answer, believing that the supplemental instruction misled the jury about the law.

### 2. Standard of Appellate Review

"Questions involving the propriety of jury instructions are mixed questions of law and fact," which this court reviews de novo with no presumption of correctness. *State v. Benson*, 600 S.W.3d 896, 902 (Tenn. 2020); *State v. Hollon*, 671 S.W.3d 561, 564 (Tenn. Crim. App. 2023).

### 3. Supplemental Jury Instruction

A defendant is entitled "to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Perrier*, 536 S.W.3d 388, 403 (Tenn. 2017) (citation and internal quotation marks omitted). In general, "trial courts have the duty, without request, to give proper jury instructions as to the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citation omitted).

Further, "[i]n order to determine whether a conviction should be reversed on the basis of an erroneous instruction to the jury, this [c]ourt must consider whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (citation and internal quotation marks omitted). A jury charge "is erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id.* (citation and internal quotation marks

33

omitted). When an error occurs in jury instructions, it is generally subject to a harmless error analysis. *Hawkins*, 406 S.W.3d at 128.

In this case, the parties agree that the supplemental instruction misled the jury into thinking they could consider other actions as the basis for a conviction in Count 4. In its closing argument, the State explicitly told the jury that Count 4 referred to the blunt force injury that occurred on December 7. Then, when the jury sought clarification of this count, it was told the exact opposite. As such, the supplemental instruction led the jury to believe that it could possibly consider any act or omission as the basis for a conviction in Count 4, even those unconnected with December 7. We agree with the parties that the instruction jeopardized the unanimity of the jury's verdict and that the error was not harmless. Count 4 must be remanded for a new trial.

Having prevailed in obtaining a new trial on Count 4, the Defendant argues that all her other convictions must also be remanded for a new trial as well. She argues that the improper instruction in Count 4 casts doubt over the jury's deliberations concerning the remaining counts. For its part, the State concedes only that Count 4 must be remanded, and it disagrees that any additional count requires a new trial as a result of the improper instruction.

From our review of the record, we see no plausible argument that the improper instruction on Count 4 affected the jury's deliberations on the felony murder or aggravated child abuse allegations in Counts 1 and 3. The charges stand alone as an alternate theory to Counts 2 and 4. They have different elements and facts and require a different analysis than the actions in Count 4. We also see no plausible argument that the improper instruction affected the other aggravated child neglect charges in Counts 9 and 10. These offenses encompass the entire course of conduct from September 28 to December 7 and, in the case of Count 10, had substantive different elements as well. Moreover, the record contains overwhelming evidence to establish J.H.'s neglect throughout his six-week stay with the Defendant. As such, jury unanimity is not at risk for the other counts, particularly as the jury was properly instructed as to these other counts.

However, a different case is present with Count 2. This count charged the Defendant with first degree murder in the perpetration of the aggravated child neglect felony alleged in Count 4, a relationship that the parties do not dispute. A guilty verdict in Count 2, then, was linked to the jury's finding that the Defendant was guilty of aggravated child neglect as alleged in Count 4. If, as all agree, the unanimity of the jury was jeopardized with respect to Count 4, then it must follow, as the night the day, that the same concern is present with the jury's consideration of that same felony in Count 2. In other words, if the jury was misled as to what they could consider for the underlying felony, then it is impossible to ensure the unanimity of the resulting felony murder, as the elements of both are identical for the underlying felony.

34

Accordingly, the Defendant's convictions in Count 2 and the predicate felony in Count 4 are reversed, and the case is remanded for a new trial on these counts alone. We specifically affirm the Defendant's conviction and life sentence for felony murder in the perpetration of aggravated child abuse in Count 1, as well as the convictions for aggravated child abuse in Count 3 and aggravated child neglect in Counts 9 and 10.

## F.    CONSECUTIVE SENTENCING

In her final issue, the Defendant argues that the trial court erred in imposing partial consecutive sentencing. Specifically, the Defendant asserts that the trial court erred when it found the Defendant a dangerous offender under Tennessee Code Annotated section 40-35-115(b)(4) but did not consider the proper factors as enumerated in *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), when making this determination. The State concedes that the trial court did not consider the *Wilkerson* factors and that the case should be remanded for resentencing. We agree.

### 1.    Background

During the sentencing hearing, the State argued for consecutive sentencing. They argued that the Defendants were dangerous offenders under Tennessee Code Annotated section 40-35-115(4) and treated J.H. so poorly that it indicated they had little to no regard for human life; therefore, the public needed to be protected from them. The Defendant argued that the dangerous offender category did not apply to her for consecutive sentencing because the factor that she had no hesitation when she committed the crime when the risk to human life was high only applied when a Defendant's actions put people other than the victim at risk. Mr. Gardner's counsel also argued that the consecutive sentencing factors did not apply.

The court sentenced the Defendant to life imprisonment on the two felony murder convictions and imposed seventeen-year sentences for her remaining convictions. The court merged the Defendant's two felony murder convictions and the two aggravated child neglect convictions. The court ordered the two seventeen-year sentences to run concurrently with each other but consecutive to the life sentence. The court agreed with the State that the Defendants were dangerous offenders because "this situation went on for a period of two and a half months" and imposed consecutive sentences.

### 2.    Standard of Appellate Review

When a defendant challenges the trial court's decision to impose consecutive sentences, we review that decision for an abuse of discretion accompanied by a

presumption of reasonableness. *See State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013). Thus, we defer to "the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" *Id.* at 861. As our supreme court has recognized, "[s]o long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* at 862.

### 3. Dangerous Offender Classification

The process of imposing discretionary consecutive sentences pursuant to Tennessee Code Annotated section 40-35-115(b) involves two steps. *See State v. Gilliam*, No. E2023-00533-CCA-R3-CD, 2024 WL 1829118, at *3 (Tenn. Crim. App. Apr. 26, 2024), *no perm. app. filed*. First, the trial court must find by a preponderance of the evidence that "the defendant qualifies for consecutive sentencing under one of the classifications set forth in section 40-35-115(b)." *State v. Perry*, 656 S.W.3d 116, 127 (Tenn. 2022) (footnote omitted). Second, the trial court must "then choose whether, and to what degree, to impose consecutive sentencing based on the facts and circumstances of the case, bearing in mind the purposes and principles of sentencing." *Id.*

In this case, the trial court found that the Defendant was a dangerous offender and qualified for consecutive sentencing pursuant to Tennessee Code Annotated section 40-35-115(b)(4). Our supreme court has held that "before imposing consecutive sentences based upon the dangerous offender classification, trial courts must conclude that the evidence has established that the aggregate sentence is 'reasonably related to the severity of the offenses' and 'necessary in order to protect the public from further criminal acts.'" *Pollard*, 432 S.W.3d at 863 (quoting *Wilkerson*, 905 S.W.2d at 938). These conclusions also must be supported by "particular facts" in the record. *See State v. Brodie*, No. M2023-00135-CCA-R3-CD, 2024 WL 3272795, at *17 (Tenn. Crim. App. July 2, 2024) ("Because the trial court failed to make any specific findings regarding Harbison's actions as they related to the *Wilkerson* factors in determining that he was a dangerous offender, the record cannot support consecutive sentencing."), *no perm. app. filed*.

In this case, the State agrees that the appropriate findings were not made to impose consecutive sentences under *Wilkerson*. As such, we cannot "presume that the consecutive sentences are reasonable," nor can we "defer to the trial court's exercise of its discretionary authority." *Pollard*, 432 S.W.3d at 863-64. Because the considerations required under *Wilkerson* involve "a fact-intensive inquiry . . . the better course is to remand to the trial court for consideration of the *Wilkerson* requirements in determining the propriety of

36

consecutive sentencing." *Id.*; *State v. Ragland*, No. W2022-01303-CCA-R3-CD, 2023 WL 3947501, at *6 (Tenn. Crim. App. June 12, 2023) (citations omitted), *no perm. app. filed*.

We respectfully vacate the order imposing consecutive sentences and remand for the trial court to consider the sentencing factors outlined in *Wilkerson*. We note that the trial court's reasoning need not be "particularly lengthy or detailed," but it "simply must set forth enough to satisfy the appellate court that [it] has considered the parties' arguments and has a reasoned basis for exercising [its] own legal decisionmaking authority." *Perry*, 656 S.W.3d at 126 (citation and internal quotation marks omitted). In all other respects, the trial court's sentences are affirmed.

## II.      ISSUES RAISED BY PHILLIP GARDNER

We now turn to Mr. Gardner's issues raised in his appeal. For this next section of our opinion, we refer to Mr. Gardner as "the Defendant."

In this appeal, the Defendant argues that the evidence is legally insufficient to support his convictions. He also asserts that the trial court erred by (1) taking his mid-trial motion for a judgment of acquittal under advisement; (2) denying the motion to sever the Defendants; (3) failing to exclude evidence of prior injuries to the child; (4) failing to instruct the jury on his alibi defense; and (5) giving an improper supplemental jury instruction.

We address each of these issues in turn.

### A.      LEGAL SUFFICIENCY OF THE EVIDENCE

The Defendant argues that the evidence is legally insufficient to support his conviction for felony murder based on aggravated child neglect and his convictions for aggravated child neglect. He asserts that the State failed to prove that he knowingly neglected J.H. because he was at work when the fatal head injury occurred. The State responds that the evidence is legally sufficient to prove aggravated child neglect and felony murder. We agree with the State.

### 1.      Standard of Appellate Review

As we observed above, "The standard for appellate review of a claim challenging the sufficiency of the State's evidence is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt." *Miller*, 638 S.W.3d at 157 (citation and internal quotation marks omitted).

### 2. First Degree Felony Murder and Aggravated Child Neglect in Counts 2 and 4

The Defendant challenges his convictions for felony murder and aggravated child neglect.[8]  We identified the statutory elements with respect to these two crimes in our discussion of Ms. Gardner's case.  Without repeating the entire discussion here, first degree felony murder as charged in Count 2 is defined as the "killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child neglect[.]"  Tenn. Code Ann. § 39-13-202(a)(2).  To sustain the Defendant's conviction for first degree felony murder, the State must first establish that the underlying felony of aggravated child neglect occurred.

In addition, Count 4 charged the Defendant with aggravated child neglect.  As we noted above, the offense of child neglect is defined as "[a]ny person who knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare."  Tenn. Code Ann. § 39-15-401(b).  As charged in this count, the offense becomes aggravated when the neglect "results in serious bodily injury to the child[.]"  *Id.* § 39-15-402(a)(1).

#### a. "Knowing" Element

The Defendant first challenges the "knowing" mens rea element of the child neglect charge.  He asserts that because he was at work on December 7, 2016, he could not have knowingly neglected J.H. on that day.  In response, the State argues that for the child neglect convictions, it was immaterial whether the Defendant was present when J.H. suffered the fatal blow.  Instead, it argues that he knowingly left J.H. in Ms. Gardner's care after a series of mysterious injuries and never sought medical help.  We agree with the State.

Our supreme court has recognized that the offense of child neglect is a nature-of-conduct offense.  *State v. Ducker*, 27 S.W.3d 889, 897 (Tenn. 2000).  As applied to a nature-of-conduct element, the mens rea of "knowingly" is established when the proof shows that "the person is *aware* of the nature of the conduct[.]"  *See* Tenn. Code Ann. § 39-11-106(23) (2018) (emphasis added).  As such, in the context of child neglect, criminal liability may

---

[8]     The Defendant also appears to challenge the sufficiency of the convicting evidence for aggravated child abuse and the corresponding felony murder count.  However, the jury acquitted him of these charges.

exist where the defendant is aware of the neglectful nature of his or her conduct, and this conduct adversely affects the child's health and welfare. *See State v. Hanson*, 279 S.W.3d 265, 277 (Tenn. 2009); *State v. Dewitt*, No. M2015-00816-CCA-R3-CD, 2016 WL 6638857, at *7 (Tenn. Crim. App. Nov. 10, 2016) ("The statute merely requires that the act of neglecting the child must be knowing."), *no perm. app. filed*. A defendant "is not required to have any awareness of the likelihood that injury could result from the neglect." *State v. Doty*, No. W2018-00701-CCA-R3-CD, 2020 WL 4045669, at *11 (Tenn. Crim. App. July 17, 2020), *no perm. app. filed*.

In this case, there is no dispute that J.H. lived with the Defendant for over one month before his death and that the Defendant, as J.H.'s father, had a legal duty to care for J.H. *See Sherman*, 266 S.W.3d at 404. There is also no dispute that the Defendant continually left J.H. in the sole care of Ms. Gardner when he went to work.

According to the medical examiner, J.H. suffered from broken ribs and a fractured nose during the time he was in the care of the Defendant and Ms. Gardner. The medical examiner confirmed that these injuries would have caused J.H. to be in obvious pain for several days and that several burns, bruises, and marks on J.H.'s body would have been visible to the Defendant. Moreover, when Ms. Perry spoke with the Defendant, he admitted that he knew about J.H.'s fall in the bathtub, as well as his black eye and the burns to his hands. He confirmed to her that J.H. was in Ms. Gardner's care during these times and that Ms. Gardner told him what happened.

Viewing the evidence in the light most favorable to the State, a rational juror could find that the Defendant was aware that his son was suffering from noticeable injuries and severe pain after being in Ms. Gardner's care. However, despite this awareness, the Defendant nevertheless continued to leave J.H. in her exclusive care on December 7, 2016, when J.H. suffered a fatal blow to his head that resulted in his death. Contrary to the Defendant's arguments, we conclude that a rational juror could have found that the Defendant acted with an awareness that his conduct in leaving his son in the care of Ms. Gardner evidenced "an absence of care or attention" in his health and welfare that placed J.H. at risk of harm. *See Neglect*, *Black's Law Dictionary* (6th ed. 1990). The evidence is legally sufficient to support the jury's finding that the Defendant knowingly neglected his son as alleged in Count 4.

### b.     "Adversely Affect" Element

The Defendant next argues that the State failed to prove that J.H.'s welfare was adversely affected by his neglect. More specifically, he asserts that his delay in seeking medical treatment for J.H. (or complete lack thereof) did not lead to an actual, deleterious effect upon J.H. Instead, he maintains that only Ms. Gardner's abuse led to an adverse

effect on J.H. and that his delay in seeking medical treatment was, therefore, inconsequential. The State responds that the evidence is sufficient to establish that element because the Defendant's neglect resulted in J.H. suffering a blow to the head that resulted in his death. We agree with the State.

As we observed above, the statute makes clear that the neglect of a child must adversely affect the child's health or welfare. Tenn. Code Ann. § 39-15-401(b); *Mateyko*, 53 S.W.3d at 671-72. Our supreme court has emphasized that the statute requires more than a mere risk of harm. Instead, "before a conviction for child neglect may be sustained, the State must show that the defendant's neglect produced an actual, deleterious effect or harm upon the child's health and welfare." *Mateyko*, 53 S.W.3d at 671-72.

As we also observed above, Count 4 was an alternative to the child abuse theory in Count 3. Although Count 3 proceeded under the theory that the Defendants directly inflicted the blunt force trauma that later resulted in J.H.'s death, Count 4 rested on the theory that the Defendants were aware that J.H. was suffering from a condition that caused him to fall or otherwise injure himself. As the State argued, the Defendants neglected J.H. by leaving him unsupervised and failing to investigate or seek medical attention for this condition, with J.H. suffering a fatal head injury as a result.

In this context, the Defendant continually left J.H. under the sole care of Ms. Gardner, where J.H. suffered multiple unexplained injuries. The Defendant admits that he knew about these injuries yet took no action to help J.H. and continued to leave him under Ms. Gardner's care. Further, according to the medical examiner, J.H.'s pain from his injuries would have been obvious to others, and the Defendant chose to ignore this, as well. The Defendant's continuous neglect of J.H. by failing to seek medical treatment, as well as his continuous neglect in leaving J.H. in the sole care of Ms. Gardner, where he would get harmed, led to the events of December 7 and J.H.'s eventual death. As such, when viewed in the light most favorable to the State, a rational juror could find that, as a result of the Defendant's neglect, J.H. suffered an actual, deleterious effect or harm upon his health and welfare.

Finally, viewing the evidence in the light most favorable to the State, a rational juror could also find that the death of J.H. occurred because of this neglect and that his death was closely connected to the neglect in time, place, causation, and continuity of action. We, therefore, conclude that the proof is legally sufficient to support the Defendant's convictions for the first degree felony murder and the aggravated child neglect of J.H. as alleged in Counts 2 and 4 of the indictment.

### 3. Aggravated Child Neglect in Counts 9 and 10

The Defendant next appears to argue that the evidence was also insufficient to support his convictions in Counts 9 and 10, which were two alternative theories of aggravated child neglect. We will address each of these theories in turn.

### a. Count 9

As set forth in the indictment, Count 9 alleged that the Defendant committed the offense of aggravated child neglect between the dates of September 28, 2016, and December 7, 2016. Therefore, Count 9 shares the same statutory elements as Count 4, though with a different date range.

In this case, J.H. was in the Defendant's care for over one month before his death. According to the medical examiner, J.H. suffered from broken ribs and a fractured nose during the time he was in the Defendant's care. The medical examiner confirmed that these injuries would have caused J.H. to be in obvious pain for several days and that several burns and marks on J.H.'s body would have been visible to the Defendant. When Ms. Perry spoke with the Defendant, he admitted that he knew about J.H.'s fall in the bathtub, as well as his black eye and the burns to his hands.

Our supreme court has recognized that a parent's decision to knowingly forgo medical treatment, with knowledge and awareness of a child's obvious physical anguish, may constitute criminal child neglect. *See, e.g.*, *State v. Adams*, 24 S.W.3d 289, 297 (Tenn. 2000). This neglect "lasts as long as such care is not provided, and a child continues to be in a situation of want as long as the morals or health of the child is endangered." *Id.* at 296. Viewing the evidence in the light most favorable to the State, a rational juror could find that the Defendant was aware that J.H. was suffering from significant injuries that were causing obvious pain, bruising, and other marks. A rational juror could also find that the Defendant knowingly neglected his son when he continually failed to seek medical treatment despite this awareness. We conclude that the proof is legally sufficient to support the Defendant's conviction for aggravated child neglect as alleged in Count 9.

### b. Count 10

As set forth in the indictment, Count 10 alleged that the Defendant committed the offense of child neglect, and the neglect "was especially heinous, atrocious or cruel, or involved the infliction of torture to the victim[.]" Tenn. Code Ann. § 39-15-402(a)(3). The offense of child neglect is defined as "[a]ny person who knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and

welfare." *Id.* § 39-15-401(b); *see Mateyko*, 53 S.W.3d at 671-72. This court has previously defined "heinous, atrocious, and cruel" as follows:

- Heinous: "Grossly wicked or reprehensible; abominable; odious; vile."

- Atrocious: "Extremely evil or cruel; monstrous; exceptionally bad; abominable."

- Cruel: "Disposed to inflict pain or suffering; causing suffering; painful."

*State v. Bradshaw*, No. W2014-00175-CCA-R3-CD, 2015 WL 523688, at \*6-7 (Tenn. Crim. App. Feb. 9, 2015) (citing *State v. Williams*, 690 S.W.2d 517, 529 (Tenn. 1985)), *perm. app. denied* (Tenn. May 18, 2015).

Although the Defendant appears to argue generally that the evidence is insufficient to support this count, he does not specifically challenge whether the neglect J.H. suffered was especially heinous, atrocious, or cruel. However, as we discussed above, J.H. was in the Defendant's care for over one month before his death. According to the medical examiner, J.H. suffered from broken ribs and a fractured nose during the time he was in the Defendant's care. The medical examiner confirmed that the rib injuries were four- to six-weeks old and would have caused J.H. to be in obvious pain. In addition, the Defendant admitted that he was actually aware that J.H. suffered several other injuries across his body as a whole that occurred at different times.

Viewing the evidence in the light most favorable to the State, a rational juror could find that the Defendant knowingly neglected his son and that the neglect was especially cruel. Given the number and nature of J.H's injuries, as well as the duration of the adverse effects to his health and welfare from the failure to seek medical care, a rational juror could find that the Defendant's neglect needlessly and callously caused J.H. to suffer significant pain above that contemplated by the neglect elements themselves. As such, we conclude that the proof is legally sufficient to support the Defendant's convictions for aggravated child neglect as alleged in Count 10.

## B.     MOTION FOR A JUDGMENT OF ACQUITTAL

The Defendant next argues that the trial court erred when it took the motion for a judgment of acquittal under advisement at the close of the State's proof. In response, the State asserts that the Defendant waived plenary review of this issue because he failed to object in the trial court. We agree with the State.

As background for this issue, Ms. Gardner's counsel made a motion for a judgment of acquittal after the State's close of proof. Counsel cited several cases discussing the differences between child abuse and child neglect and then asked the court to review the cases overnight. The Defendant's counsel then joined the motion, asking for the court's ruling to apply to him as well. The court agreed and took the motion under advisement.

The following day, the trial court denied the motion. The court noted that it had read numerous cases and found that the facts here were "significantly murky." Characterizing the issue as close, it nevertheless denied the motion and allowed the codefendants to proceed with their respective cases.

Citing *Mathis v. State*, 590 S.W.2d 449 (Tenn. 1979), the Defendant now argues that it was reversible error for the trial court to have taken the motion under advisement. We respectfully disagree. The supreme court's decision in *Mathis* does not prohibit a trial court from carefully considering a motion for a judgment of acquittal while taking the necessary time to do so. It only holds that when the motion is made after the State's case, the court must consider only the State's evidence and rule on the motion before allowing the trial to proceed. *Mathis*, 590 S.W.2d at 453 (finding error when the trial judge "elected to take the motion under advisement and hear the entire case before making a final ruling"). In the present case, the trial court ruled on the motion for judgment of acquittal before allowing the defense to present its evidence. Taking a reasonable period to consider the motion was both appropriate and within the court's discretion. The Defendant is not entitled to relief on this issue.

## C.     SEVERANCE OF DEFENDANTS

The Defendant next argues that the trial court erred in failing to sever the Defendants' cases pursuant to Tennessee Rule of Criminal Procedure 14. He asserts that because the State confirmed his alibi for December 7, 2016, any evidence about that date was prejudicial to him. He further alleges that with a severance, "no direct or circumstantial evidence" would have been offered against him.

In response, the State observes that the Defendant did not file a motion to sever Defendants prior to trial. It also asserts that the Defendant has failed to show that he suffered any prejudice, particularly given that he was acquitted on the charges of aggravated child abuse. We conclude that the Defendant did not properly preserve this issue for plenary review on appeal.

The Tennessee Rules of Criminal Procedure require that a motion to sever defendants must be raised before trial. Tenn. R. Crim. P. 12(b)(2)(E). If a party does not file a motion to sever before trial, then the party waives consideration of the issue. *See* Tenn. R. Crim. P. 12(f)(1); *State v. Branham*, 501 S.W.3d 577, 591 (Tenn. Crim. App. 2016); *State v. Williams*, No. W2018-00924-CCA-R3-CD, 2020 WL 211546, at \*28 (Tenn. Crim. App. Jan. 14, 2020) ("The Defendant did not file a pretrial motion to sever and has therefore waived consideration of the issue."), *perm. app. denied* (Tenn. June 5, 2020).

However, the mere filing of a pretrial motion "is not sufficient to raise an issue for the court to decide." *See State v. Hurn*, No. E2022-01192-CCA-R3-CD, 2023 WL 7001621, at \*8 (Tenn. Crim. App. Oct. 24, 2023), *perm. app. denied* (Tenn. Apr. 11, 2024). Instead, to avoid waiving the issues raised by a pretrial motion, a defendant must affirmatively "bring [the] motion to the attention of the trial judge and have the trial judge rule upon the motion prior to trial." *State v. Aucoin*, 756 S.W.2d 705, 709 (Tenn. Crim. App. 1988); *State v. Burton*, 751 S.W.2d 440, 445 (Tenn. Crim. App. 1988) (citing Tenn. R. Crim. P. 12(b)(3)). Indeed, "if a written motion is filed and the moving party takes no further action to bring the motion to the trial court's attention, the motion will be treated as abandoned." *Hurn*, 2023 WL 7001621, at \*8 (citing *State v. Banks*, 271 S.W.3d 90, 170 (Tenn. 2008)).

In this case, the Defendant never filed a motion to sever his case from his codefendant. Although his codefendant filed such a limited motion to sever based on *Bruton* issues,[9] *see* Tenn. R. Crim. P. 14(c)(1), the Defendant did not join the motion during its litigation. In fact, the trial court's written order recognized that only Ms. Gardner had requested relief.

Some fifteen months later, the Defendant's newly appointed counsel filed a request to join all of Ms. Gardner's previously argued motions. He asserted that this request was "to protect his rights should this matter require judicial review." In response, the trial court subsequently issued an order that joined the Defendant in all previously argued motions so that "the record does not reflect that [the Defendant] waived the aforementioned arguments

---

[9] *See Bruton v. United States*, 391 U.S. 123 (1968) (holding that allowing a codefendant's inadmissible confession that implicates the defendant in a joint trial violates the defendant's Sixth Amendment right to confrontation).

at the trial level." Importantly, the trial court added that the "Latonia Gardner rulings be applied to Phillip Gardner if appropriate."

In its discretion, a trial court may permit a defendant to join a specific motion filed by a codefendant. *See United States v. Nance*, 168 F. Supp. 3d 541, 554 (W.D.N.Y. 2016) (granting a motion to join where the defendant also has standing and relief would be applicable to the defendant); *but see United States v. Cobb*, 544 F. Supp. 3d 310, 344 (W.D.N.Y. 2021) (adopting a policy "requiring each defense counsel to independently file motions on behalf of their clients and not simply file boilerplate motions seeking to 'join in relevant motions of co-counsel.'"). However, unless the defendant raises additional grounds for relief, the joining defendant will necessarily be limited to the issues actually raised and decided in the original motion.

Here, Ms. Gardner's motion only sought severance pursuant to Tennessee Rule of Criminal Procedure 14(c)(1) because of *Bruton* issues. It did not seek a severance under Rule 14(c)(2), as the Defendant does in this court, or argue that a severance was necessary to achieve a fair determination of the guilt or innocence of one or more defendants. By joining Ms. Gardner's motion and having its ruling apply to him, the Defendant arguably achieved only the preservation of her *Bruton* issues, nothing more.[10]

Had the Defendant wished to raise a severance issue on grounds other than *Bruton*, he was first required to raise that issue in a written motion before trial. Tenn. R. Crim. P. 12(b)(2)(E). He was then obligated to bring that motion to the trial court's attention and seek a ruling from the court before trial. *Hurn*, 2023 WL 7001621, at *8. He did neither. Instead, he asks us to place the trial court in error on an issue that it was never asked to consider or rule upon in the first instance.[11] We respectfully decline the invitation. *See*

---

[10] This case illustrates well the dangers of uncritically joining motions filed by other parties. Ms. Gardner sought a severance because of concerns that the Defendant's statements would be used against her. Because the Defendant's own statements would be admissible against him in any event, this request for *Bruton* relief is nonsensical when applied to the Defendant himself. *Cf. State v. Luckie*, 106 N.E.3d 289, 298 (Ohio Ct. App. 2018) ("The testimony concerned Appellant's own statement, not that of Ramirez, his non-testifying co-defendant. Therefore, the testimony does not implicate *Bruton* as to Appellant."). By joining this motion without a further request for relief, he effectively preserved no issue at all for further review.

[11] Despite not raising this issue before trial, the Defendant attempted to raise it after trial in his motion for a new trial. This action failed to preserve the issue for appellate review. *See State v. Vance*, 596 S.W.3d 229, 253 (Tenn. 2020) ("[A] party is bound by the ground asserted when making an objection to the admission of evidence and cannot assert a new or different theory to support the objection in the motion for new trial."). Indeed, it is well-established that "[w]hen a party abandons the ground asserted when the objection was made and asserts completely different grounds in the motion for a new trial and in [the appellate] court, the party waives the issue." *State v. Howard*, No. M2020-01053-CCA-R3-CD, 2021

45

*Thompson*, 2023 WL 4552193, at \*4 ("[W]e have been extremely hesitant to put a trial court in error where its alleged shortcoming has not been the subject of a contemporaneous objection." (citation and internal quotation marks omitted)).

We conclude that the Defendant has waived plenary review of whether a severance of defendants should have been granted pursuant to Rule 14(c)(1). Because the Defendant does not request plain error review otherwise, we do not consider the issue further. *See State v. Woodruff*, No. W2023-01446-CCA-R3-CD, 2024 WL 2874583, at \*3 (Tenn. Crim. App. June 7, 2024), *no perm. app. filed*. The Defendant is not entitled to relief.

### D.    EVIDENCE OF PRIOR INJURIES

The Defendant next appears to argue that the State failed to establish venue because he asserts that J.H.'s injuries occurred in Ohio and not in Davidson County. He further asserts that the trial court erred in failing to exclude evidence of these previous injuries under Rule 404(b) of the Tennessee Rules of Evidence. The State responds that there was sufficient evidence the offenses were committed in Davidson County and that the trial court properly held that Rule 404(b) did not control whether the evidence of prior injuries was admissible. We agree with the State.

### 1.    Venue

The Defendant first argues that venue was never established because, he claims, the injuries inflicted upon J.H. occurred while in the care of Ms. Hunter in Ohio. In response, the State argues that venue was established because the proof showed that the offenses happened in Davidson County. We agree with the State.

A defendant has the right to be tried by an impartial jury of the county in which the crime was committed. Tenn. Const. art. I, § 9; Tenn. R. Crim. P. 18. As our supreme court has recognized, "[p]roof of venue is necessary to establish the jurisdiction of the court, but it is not an element of any offense and need only be proved by a preponderance of the evidence." *State v. Young*, 196 S.W.3d 85, 101 (Tenn. 2006). The question of venue is for the jury to decide. Venue may be established by circumstantial evidence, and "the jury is entitled to draw reasonable inferences from the evidence." *Id.* at 101-02.

Initially, the Defendant alleged in his motion for a new trial and on appeal that the venue of the "suspected abuse" was not established. However, the jury found the

---

WL 5918320, at \*6 (Tenn. Crim. App. Dec. 15, 2021), *no perm. app. filed*; *see also State v. Schiefelbein*, 230 S.W.3d 88, 129 (Tenn. Crim. App. 2007).

Defendant not guilty of the child abuse charge and its associated felony murder count. As such, any issue as to venue for the child abuse allegations has been rendered moot by the jury's acquittal. *See State v. Adams*, 916 S.W.2d 471, 477 (Tenn. Crim. App. 1995) ("When the trial court granted the motion for judgment of acquittal, it rendered the issues contained in the appellee's motion for new trial moot."); *State v. Amble*, No. E2016-02495-CCA-R3-CD, 2018 WL 1989632, at *2 (Tenn. Crim. App. Apr. 27, 2018) (recognizing that "an issue is moot upon acquittal"), *perm. app. denied* (Tenn. Sept. 13, 2018).

However, for two reasons, we conclude that venue in Davidson County was plainly established with respect to the child neglect charges. First, the elements of aggravated child neglect do not require that particular injuries occur in Tennessee. *See* Tenn. Code Ann. §§ 39-15-401(b); 39-15-402(a)(3). As such, even if J.H.'s injuries occurred in Ohio—and we note that the Defendant admitted to knowing that at least some of the injuries occurred in Tennessee—the place where J.H.'s injuries were inflicted is immaterial if the Defendant's knowing neglect occurred in this state.

Second, the evidence establishes that the Defendant's knowing neglect of J.H. occurred in Davidson County. As we explained above, a rational juror could find that the Defendant knowingly neglected the victim when he continually failed to seek medical treatment despite knowing about many of his unexplained injuries. Additionally, a rational juror could have found that J.H. would have been in visible pain due to several of his injuries, and, as such, the Defendant would have known of the pain and the associated injuries. Yet, he continually chose not to seek medical treatment, and all of these decisions occurred in Davidson County. Moreover, despite knowing about all these injuries, the Defendant still decided to leave J.H. in the exclusive care of Ms. Gardner on December 7, 2016, in Davidson County, when J.H. suffered a fatal blow to his head that resulted in his death.

From our review of the record, all of the events surrounding the Defendant's own aggravated child neglect that ultimately led to J.H.'s death occurred in Davidson County. As such, because a rational juror could find, by a preponderance of the evidence, that the offenses of felony murder and aggravated child neglect occurred in Davidson County, the State established venue by a preponderance of the evidence. The Defendant is not entitled to relief on this issue.

## 2. Tennessee Rule of Evidence 404(b)

The Defendant also argues that the trial court erred when it failed to exclude evidence of J.H.'s prior injuries pursuant to Tennessee Rule of Evidence 404(b).[12] Specifically, he claims that the trial court erred in finding that the State had met "the requisites of 404(b)" and that the danger of unfair prejudice outweighed the probative value of the evidence. The State responds that because there was no evidence as to the identity of the person who inflicted the injuries, Rule 404(b) did not apply. We agree with the State.

Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." The rationale supporting the rule is that the admission of such evidence "carries with it the inherent risk of the jury convicting a defendant of a crime based on his or her bad character or propensity to commit a crime, rather than the strength of the proof of guilt on the specific charge." *Eady*, 685 S.W.3d at 712 (citation and internal quotation marks omitted).

Importantly, unless the evidence shows that the defendant committed the prior act, the evidence cannot show "that the defendant had a criminal disposition and that he could be expected to act in conformity therewith." *State v. Stevens*, 78 S.W.3d 817, 837 (Tenn. 2002). Thus, in the context of child abuse cases, our supreme court has recognized that Rule 404(b) does not exclude evidence of a child's prior injuries if the evidence does not show that the defendant inflicted the injuries.

For example, in *State v. DuBose*, 953 S.W.2d 649 (Tenn. 1997), the defendant was convicted of felony murder committed during the perpetration of child abuse, and the court allowed evidence of prior abdominal injuries to be admitted over the defendant's objection. *Id.* at 653. Our supreme court then held that "[s]ince the evidence admitted did not show the identity of the person who caused the prior abdominal injuries sustained by the victim, it was not inadmissible under Rule 404(b) as reflecting upon the character of the defendant." *Id.*; *see also State v. Gomez*, 367 S.W.3d 237, 245 n.6 (Tenn. 2012) ("In this case, the assaults [on the child] were committed by Mr. Gomez. Rule 404(b) therefore is inapplicable as to Ms. Lopez."). As such, if the evidence does not show that the defendant caused the child's prior injuries, "the relevancy of the evidence should be tested under Tennessee Rules of Evidence 401 and 402, not 404(b)." *State v. Lacy*, 983 S.W.2d 686, 692 (Tenn. Crim. App. 1997) (citing *DuBose*, 953 S.W.2d at 654).

---

[12] The Defendant does not argue that this evidence is inadmissible under other evidence rules or statutes, save for the relevance of the previous injuries. *See* Tenn. R. Evid. 402. We addressed the relevance of this evidence in our discussion of the expert testimony issues, and because the Defendant argues no grounds for exclusion other than Rule 404(b), we limit our discussion to that issue.

In this case, the trial court correctly held that Rule 404(b) did not apply because there was no evidence that the defendant inflicted the prior injuries. Without this evidence, J.H.'s prior injuries do not show that the Defendant had a criminal disposition and acted in conformity therewith. *See Stevens*, 78 S.W.3d at 837. In other words, because it was never claimed that the Defendant inflicted the prior injuries, the evidence could not reflect on his character and, therefore, be excluded by Rule 404(b) as it applied to him. Because the trial court correctly determined that Rule 404(b) did not apply to this evidence, the Defendant is not entitled to relief on this issue.

### E.    JURY INSTRUCTIONS

The Defendant next argues that the trial court improperly gave a supplemental jury instruction in response to a jury question. He also asserts that he was entitled to an alibi instruction. We address each of these issues in turn.

### 1.    Standard of Appellate Review

A defendant is entitled "to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *Perrier*, 536 S.W.3d at 403 (citation and internal quotation marks omitted). In general, "trial courts have the duty, without request, to give proper jury instructions as to the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial." *Hawkins*, 406 S.W.3d at 129 (citations omitted). A jury charge "is erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *James*, 315 S.W.3d at 446 (citation and internal quotation marks omitted). "Questions involving the propriety of jury instructions are mixed questions of law and fact," which this court reviews de novo with no presumption of correctness. *Benson*, 600 S.W.3d at 902; *Hollon*, 671 S.W.3d at 564.

### 2.    Jury Question and Supplemental Instruction

Like his co-defendant, the Defendant argues that the trial court improperly gave a supplemental jury instruction in response to a jury question. Specifically, the Defendant asserts that the trial court provided a contradictory and misleading instruction that jeopardized the jury's unanimity and undermined the verdict's integrity. The State concedes this point and agrees that Count 4 should be remanded for a new trial. We agree.

As discussed above, the parties agree on appeal that the supplemental instruction misled the jury into thinking they could consider other actions as the basis for a conviction in Count 4. We agree with the parties that the instruction jeopardized the unanimity of the

jury's verdict and that the error was not harmless. For the reasons we have discussed, Count 4 must be remanded for a new trial.

The Defendant further argues that his remaining convictions must also be remanded for a new trial as well. For the reasons given above in our analysis of Ms. Gardner's nearly identical argument, we agree with respect to Count 2 but respectfully disagree as to Counts 9 and 10. As such, we vacate the convictions in Counts 2 and 4 and remand the case for a new trial on these counts alone.

### 3. Alibi

Finally, the Defendant argues that the trial court should have given an alibi jury instruction because he was not home when J.H. suffered the trauma to his head on December 7, 2016. The State responds that any error was harmless because the jury acquitted him of the abuse that occurred on December 7, 2016. We agree with the State.

We have defined an "alibi" as being "[a] defense based on the physical impossibility of a defendant's guilt by placing the defendant in a location other than the scene of the crime at the relevant time." *State v. Looper*, 118 S.W.3d 386, 416-17 (Tenn. Crim. App. 2003). Importantly, however, an alibi defense cannot be fairly raised by the evidence without a physical impossibility of committing the crime. *See State v. Gomez*, No. M2018-00529-CCA-R3-CD, 2019 WL 911160, at *4 (Tenn. Crim. App. Feb. 22, 2019), *no perm. app. filed*; *Looper*, 118 S.W.3d at 417 (recognizing that "the essence of an alibi is the physical impossibility of a defendant's having been at the scene when the crime was committed").

The trial court must instruct the jury of an alibi defense when it is fairly raised by the evidence, regardless of whether the defendant requests the instruction. *Manning v. State*, 500 S.W.2d 913, 915 (Tenn. 1973). In *Manning*, our supreme court identified three sets of circumstances where an alibi defense could be fairly raised: "(1) where the defendant's alibi has been corroborated by other credible witnesses; (2) where the victim has been unable to identify the defendant; [or] (3) where the proof against the defendant is wholly circumstantial." *Id.* at 916 (citations omitted). A failure to instruct the jury of an alibi defense when the proof fairly raises it could constitute reversible error. *Moffitt v. State*, 29 S.W.3d 51, 57 (Tenn. Crim. App. 1999).

In this case, the State's proof supported the Defendant's alibi. It introduced evidence that the Defendant was at work on December 7, 2016, when J.H. suffered the fatal blow to his head. Indeed, Detective Vaughn testified that she confirmed that the Defendant was at work that day. As such, because the relevant evidence fairly raised an alibi defense, the Defendant was entitled to an alibi instruction with respect to the *child abuse* charges. That

said, because the Defendant was acquitted of these charges, the failure to give an instruction as to Counts 1 and 3 could not have affected the jury's verdict. *See State v. Cecil*, 409 S.W.3d 599, 610 (Tenn. 2013) ("In order to determine whether an instructional error is harmless, the appellate court must ask whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (citation and internal quotation marks omitted)). We conclude that any error in failing to give an alibi instruction as to the child abuse charges was clearly harmless beyond a reasonable doubt. *Cf. Benson*, 600 S.W.3d at 907 (analyzing a failure to instruct on a general defense under constitutional harmless error standard).

However, there was no error in failing to give an alibi instruction as to the *child neglect* charges. No evidence shows that the Defendant's being at work prevented him from arranging medical care for his son's serious injuries that were obvious and actually known to the Defendant. Indeed, despite knowing about these injuries, the Defendant still decided to leave J.H. in the care of Ms. Gardner on December 7, 2016. In other words, because nothing about the Defendant's being at work on that day, or any other day, rendered his neglect impossible to commit, the proof did not fairly raise an alibi defense as it applied to the child neglect charges and its associated felony murder count. We conclude that the Defendant is not entitled to relief on this ground.

## III. CORRECTION OF JUDGMENTS OF CONVICTION

On our own motion, we note an issue with the count numbers reflected in the judgments of conviction as to both Defendants. As noted above, Counts 9 and 10 were renumbered for the trial jury as Counts 5 and 6. This procedure was perfectly permissible. *See supra*, footnote 7. However, once the trial is concluded, the judgments "must correctly reflect the charges as presented in the indictment and the disposition for each indicted offense." *State v. Bullock*, No. E2021-00661-CCA-R3-CD, 2022 WL 3012460 (Tenn. Crim. App. July 29, 2022), *no perm. app. filed*. As such, the judgments should reflect the disposition of the charges as they were brought and numbered by the grand jury rather than as they were presented to the trial jury. *See State v. Jones*, No. W2022-00046-CCA-R3-CD, 2023 WL 1980871, at *1 (Tenn. Crim. App. Feb. 14, 2023) ("For the sake of consistency with the transcripts, we will refer to the counts as renumbered by the trial court; however, we note that the judgment forms must be corrected to reflect the counts as enumerated in the indictment."), *perm. app. denied* (Tenn. May 15, 2023).

In this case, the judgments in each case reflect dispositions on Counts 9 and 10 as they were renumbered for the trial jury, not as they were originally charged.[13] As such, on

---

[13] These inadvertent misidentifications occur in both the count designations and in the "Special Conditions" boxes.

remand, the trial court is respectfully requested and ordered to correct the judgments to reflect the enumeration of the counts as charged by the grand jury.

## CONCLUSION

In summary, we affirm Ms. Gardner's conviction and life sentence for felony murder in the perpetration of aggravated child abuse and her conviction for aggravated child abuse in Count 3. As to both Defendants, we affirm their respective convictions for aggravated child neglect in Counts 9 and 10. However, we respectfully reverse and vacate the Defendants' convictions in Counts 2 and 4 and remand those charges for a new trial. Upon the agreement of the parties, we also respectfully reverse Ms. Gardner's consecutive sentences and remand those counts for the trial court to consider the factors outlined in *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995). Finally, we remand each case for entry of corrected judgments of conviction. In all other respects, we affirm the judgments of the trial court.

_____
TOM GREENHOLTZ, JUDGE